JOSHUA C. AGSALUD, Director of the Department of Labor and Industrial Relations, Appellant-Appellant, *v.* CENTRAL TRANSPORTATION COMPANY, Appellee-Appellee, and SAMSON PALAKIKO, Appellee

NO. 10747

(CIV. NO. 83206)

FEBRUARY 13, 1986

LUM, C.J., NAKAMURA, PADGETT, HAYASHI,
AND WAKATSUKI, JJ.

OPINION OF THE COURT BY NAKAMURA, J.

The issue in this appeal by the Director of Labor and Industrial Relations (the director) from a circuit court judgment affirming a ruling by the Referee for Unemployment Compensation Appeals is whether benefits erroneously paid to Samson Palakiko are chargeable to the account of his employer, Central Transportation Company. Though the overpayment of benefits resulted from the employer's error in reporting the claimant's earnings, the referee ruled there was no statutory authority to charge the payments to the employer's account, and the circuit court agreed. Concluding from a review of the record and relevant statutory provisions that the referee erred, we reverse the judgment.

I.

Samson Palakiko filed a claim for unemployment benefits on March 21, 1983. Although he was still employed as a part-time worker by Central Transportation, he was nevertheless "unemployed" for purposes of the Employment Security Law, Hawaii Revised Statutes (HRS) Chapter 383,[1] and eligible for benefits by virtue of HRS § 383-23

---

[1]HRS § 383-1(16) defines "unemployment"as follows:
An individual shall be deemed "unemployed" in any week during which he performs no

if his earnings during any week were less than the weekly benefit a claimant with his history of prior employment and earnings is entitled to under the law.[2] Since Palakiko's eligibility for benefits depended upon the wages he earned in the four completed calendar quarters preceding that in which he filed the claim (the base period)[3] and his maximum weekly benefit was determinable by what was earned during the quarter of the base period in which his total wages were the highest,[4] the department reviewed the wages reported by Central Transportation as having been paid to him in 1982, the relevant base period.

But the report submitted by Central Transportation did not reflect Palakiko's base-period earnings accurately. His wages for the last quarter of 1982 were grossly overstated—what was reported as earned during the period were actually his total wages for the calendar year. On the

---

services and with respect to which no wages are payable to him, or in any week of less than full time work if the wages payable to him with respect to such week are less than his weekly benefit amount. The department shall prescribe regulations applicable to unemployed individuals making such distinctions in the procedures as to total unemployment, part-total unemployment, partial unemployment, of individuals attached to their regular jobs, and other forms of short-time work, as the department deems necessary. "Week of unemployment" means a week in which an individual is deemed unemployed.

[2]HRS § 383-23 reads:
Weekly benefit for unemployment. Each eligible individual who is unemployed, as defined in section 383-1(16), in any week shall be paid with respect to such week a benefit in an amount equal to his weekly benefit amount less that part of the wages (if any) payable to him with respect to such week which is in excess of $2. The benefit, if not a multiple of $1, shall be computed to the next higher multiple of $1.

[3]HRS § 383-1(1) defines "base period" as follows:
"Base period," with respect to benefit years beginning after June 30, 1951, means the four completed calendar quarters immediately preceding the first day of an individual's benefit year.
A "benefit year" is defined by HRS § 383-1(3) in these terms:
"Benefit year" with respect to any individual means the one-year period beginning with the first day of the first week with respect to which the individual first files a valid claim for benefits and thereafter the one-year period beginning with the first day of the first week with respect to which the individual next files a valid claim for benefits after the termination of his last preceding benefit year.

[4]HRS § 383-22(b) in relevant part reads:
(b) In the case of an individual whose benefit year begins on or after January 2, 1966, his weekly benefit amount shall be, except as otherwise provided herein, an amount equal to one twenty-fifth of his total wages for insured work paid during the calendar quarter of his base period in which such total wages were highest.

basis of this information the department determined Palakiko's weekly benefit for the following one year period (the benefit year), *see supra* note 3, would be $178 less whatever he earned in part-time employment. *See supra* notes 1 and 2. The department issued a "Determination of Insured Status" that reiterated the wage data supplied by the employer and apprised the claimant of his eligibility for benefits as determined above. A copy of the document was also transmitted to the employer. And between April 2, 1983 and February 18, 1984, Palakiko received weekly benefits in amounts ranging from $18 to $178.

On February 24, 1984, while discussing his earnings with the social worker processing his application for medical assistance payments, Palakiko realized an error probably had been made in computing his unemployment benefits. He reported the probable error promptly, and the department reconsidered the earlier determination of his weekly benefit amount in light of the information furnished by him. The employer subsequently acknowledged it had misreported Palakiko's earnings for the last quarter of 1982, and the department issued a revised benefit determination.

The new determination set Palakiko's weekly benefit amount at $71 rather than $178; the claimant was also apprised that during the 40 weeks between April 20, 1983 and February 18, 1984 in which he earned more than $71 he was "not unemployed and [thus] ineligible for benefits" and during the 4 weeks in the same period in which he earned less than $71 his weekly benefit should have been reduced by the amounts he earned. The employer was notified of an overpayment of $2,942 resulting from its "failure to file as required: Correct 4th quarter earnings for 1982 on UC-BP-24 filed on 3/24/83," and it was advised that the overpaid benefits would be charged to its reserve account.

The employer appealed the decision to charge the benefits to its account. At the hearing conducted by the Referee for Unemployment Compensation Appeals the employer's representative admitted the overstatement of Palakiko's wages "was an error on [its] part" in "picking up the amounts from the computer printout." Viewing the issue before him as one involving the application of HRS § 383-33, the referee reversed the department and ruled the "employer [was] not liable for the overpayment." He found the language of the statute was "plain and unambiguous" and "that the employer had complied with [its] requirements." He concluded "[t]he employer [was] not a non-complying employer" and there was no statutory authority for charging the over-

paid benefits to its reserve account. And he also "advised [the department] to proceed with an investigation whether or not the claimant [was] liable for the overpaid amount."[5]

The director perfected a timely appeal from the referee's decision to the Circuit Court of the First Circuit. The decision was affirmed by the circuit court and the director now appeals to this court.

## II.

The issue on appeal being whether benefit overpayments attributable to an employer's error in reporting an employee's base-period wages are chargeable against its reserve account in the unemployment compensation fund, we begin our analysis by turning to the section of the Employment Security Law entitled "Charges and non-charges for benefits," HRS § 383-65. The section evinces a general design to hold an employer accountable for benefits paid to its employees, for the opening sentence of HRS § 383-65(a) reads in part: "Except as otherwise provided in this section, benefits paid to an individual shall be charged against the accounts of his base period employers . . . ." The situations in which benefits are not charged against base-period employers are described thereafter in subsections (b) through (g). The only subsection dealing with overpaid benefits is § 383-65(f), which reads:

> Any benefit overpaid to a claimant as a result of ineligibility or disqualification under sections 383-29 and 383-30 shall not be charged to the reserve account of a base period employer on a contributory plan unless such overpayment resulted from the employer's failure to furnish information as required by this chapter or the rules and regulations of the department.

The question then is whether the foregoing provisions or those in HRS § 383-33 apply to the situation at hand.

---

[5]The department, however, had conducted an investigation earlier and found no fraud on claimant's part that might have caused the overpayment. Furthermore, he is not a party to this appeal, since any and all claims against him were dismissed by stipulation and he was dismissed as a party, also by stipulation.

## A.

The department originally determined from the information furnished by Central Transportation that Samson Palakiko was entitled to a weekly benefit of $178. But upon confirmation of the employer's reporting error, the department revised the determination, ruling instead that the claimant's correct weekly benefit amount was $71, he was not "unemployed" within the meaning of the law and ineligible for benefits during forty of the weeks in which benefits were paid, he received more than he was entitled to during four weeks, and the benefits overpaid during the forty-four week period were chargeable against the employer's reserve account. Under these circumstances, we think HRS § 383-65(f) applies.

The subsection reflects a policy not to charge an employer's account for benefits paid to a claimant who is later found to be ineligible.[6] But the policy does not apply when the overpayment is the result of the employer's failure to furnish information required under the law or regulations of the department. Here, the claimant was paid benefits for forty weeks when he did not fulfill the prime eligibility requirement of being "unemployed"[7] because he earned wages in excess of $71 during those weeks, and during four weeks he was paid more than he was eligible for as a "partially unemployed" person. *See supra* note 1 and HRS § 383-23.[8] We can only conclude the benefits were overpaid as a result of a determination of ineligibility by the department. Whether or not the overpayment "resulted from the employer's failure to furnish

---

[6]The unfairness of charging an employer's account when benefits have been overpaid as a result of the department's misapplication of the law or a claimant's misrepresentation is patent and needs no belaboring.

[7]HRS § 383-29 begins: "An unemployed individual shall be eligible to receive benefits with respect to any week only if the department of labor and industrial relations finds that: . . . ."

[8]The weekly benefit a "partially unemployed" person may receive is determined under HRS § 383-23, which reads:

Weekly benefit for unemployment. Each eligible individual who is unemployed, as defined in section 383-1(16), in any week shall be paid with respect to such week a benefit in an amount equal to his weekly benefit amount less that part of the wages (if any) payable to him with respect to such week which is in excess of $2. The benefit, if not a multiple of $1, shall be computed to the next higher multiple of $1.

information as required by [Chapter 383] or the rules and regulations of the department" remains for resolution.

## B.

Though the employer acknowledged it had grossly overstated the claimant's earnings for the last quarter of 1982, the referee found "the employer had complied with the requirements of the statute" by "provid[ing] the information which was necessary to determine whether and in what amount the claimant was entitled to unemployment benefits."[9] Viewing the issue before him as one calling for the application of HRS § 383-33,[10] the referee concluded there was no statutory authority authorizing the department to charge the overpaid benefits against the employer's reserve account. The finding is clearly erroneous, and the statute was misapplied.

---

[9]The referee's findings and conclusions were couched in these terms:

The language of the statute is plain and unambiguous. The employer is liable for the overpayment if they had failed to provide information regarding the claimant wages, or weeks of employment and reason for separation. In this case, the evidence shows that the employer had complied with the requirements of the statute and accordingly the Department proceeded to render a determination based on the employer's report. In essence, the employer had provided the information which was necessary to determine whether and in what amount the claimant was entitled to unemployment benefits. The issue in this case does not fit the concern expressed in Section 383-33 in that the employer did not fail to furnish the necessary information. The necessary information was provided, however, the report was erroneous. The employer is *not* a non-complying employer. Although the employer was partially at fault for the overpayment, I find no authority which provides that they are liable for the overpayment. Section 383-33 primarily addresses the situation in which the Department rendered a determination solely on the claimant's statement/affidavit on his employment and wages. In such a case, the late complying employer is held liable for the amount of overpayment if the amount of the claimant's entitlement is reduced.

[10]HRS § 383-33, entitled "Determinations, in general," reads:

Determinations, in general. A determination upon a claim filed pursuant to section 383-32 shall be made promptly by a representative of the department of labor and industrial relations authorized to make determinations upon claims and shall include a statement as to whether and in what amount the claimant is entitled to benefits for the week with respect to which the determination is made and, in the event of a denial, shall state the reasons therefor. A determination with respect to the first week of a benefit year shall also include a statement as to whether the claimant has been paid the wages required under section 383-29(a)(5) and, if so, the first day of the benefit year, his weekly benefit amount, and the maximum total amount of benefits payable to him with respect to such benefit year.

To begin, while Central Transportation supplied the department with wage data, it definitely failed to "provide[] the information which was necessary to determine . . . in what amount [Samson Palakiko] was entitled to unemployment benefits." An eligible claimant's weekly benefit amount is set by law at "an amount equal to one twenty-fifth of his total wages . . . during the calendar quarter of his base period in which such total wages were the highest." HRS § 383-22(b). Since the employer reported the employee's wages for the calendar year as his wages for the last quarter of 1982, the department was without information needed to determine what Samson Palakiko should receive. From the information provided it could only find the last quarter was the quarter in which the total wages were the highest, when in fact the second was,[11] and arrive at a decision that more than doubled the weekly benefit. Compliance with a duty to furnish information "necessary to determine . . . in what amount the claimant was entitled to unemployment benefits" entails more than the mere submission of a report.

What the department requires in determining a claimant's weekly benefit are the total wages paid to him in each of the four completed calendar quarters preceding that in which the claim is filed. Here, the department received the information in a form rendering a proper

---

If any employer fails to furnish the information necessary to determine whether and in what amount the claimant is entitled to benefits in the manner and within the time specified by this chapter or regulations of the department, the department shall make a determination based upon such information as is available. In the absence of fraud, any redetermination made on the basis of information furnished by the employer after the prescribed period shall be effective only as to benefits paid after the week in which the information was received. In the absence of a showing by the employer satisfying the department that he could not reasonably comply with the department's requirement, any benefits overpaid prior to the effective date of the redetermination as a result of the employer's failure to furnish the information as required shall be charged entirely against the account of the non-complying employer; provided that the overpaid benefits shall not, in any event, be recoverable from the claimant.

[11]The information submitted by the employer indicated the claimant earned wages amounting to $1,447.50 in the first quarter, $1,768.50 in the second, $1,197.70 in the third, and $5,886.70 in the last. The sum reported for the last quarter, however, was the total for the year. Thus it appears the claimant earned $1,473.00 in the last quarter. The quarter in which the claimant's earnings were the highest was the second, and one twenty-fifth of $1,768.50 is $70.74. The weekly "benefit, if not a multiple of $1, [is] computed to the next higher multiple of $1," HRS § 383-23, and the correct weekly benefit amount was $71 rather than $178.

determination impossible. This resulted in an overpayment of benefits and a subsequent declaration of the claimant's ineligibility for most of what was paid. And since the "overpayment resulted from the employer's failure to furnish information as required," the overpaid benefits were chargeable against the employer's reserve account. HRS § 383-65(f).

The referee, however, ruled the benefits were not chargeable in this instance because there was no statutory basis for doing so, and the circuit court affirmed his ruling. But the referee and the circuit court reviewed the agency ruling in the light of the second paragraph of HRS § 383-33. *See supra* note 10. The paragraph covers the department's power to make benefit determinations "upon such information as is available," including the self-serving statements of a claimant, when an employer fails to submit a wage and separation report.[12] Since Central Transportation submitted a report, the sanction therein of charging benefits premised on "such information as is available" to the account of the defaulting employer has no application. But this does not mean an employer who submits erroneous information resulting in the overpayment of benefits is not accountable for its error, for HRS § 383-65 clearly authorizes the charging of such benefits.

Having concluded there was a misapplication of the statute, we reverse the judgment of the circuit court. The case is remanded to the circuit court for the entry of a judgment consistent with this opinion.

*Dwight K. Nadamoto,* Deputy Attorney General, on the brief for appellant-appellant.

Central Transportation Co., appellee-appellee pro se; no brief filed.

[12]That the second paragraph is limited to this situation is clear from a legislative committee report accompanying the bill enacting the language in question. The report from the Senate Committee on Labor on the measure, in relevant part, read:

The purpose of this bill is to amend the Unemployment Compensation Law to provide that in the event an employer fails to file the required wage and separation report, the separated individual shall be entitled to benefits based upon his own statement and that benefits so paid, in the absence of fraud, shall not be subject to repayment by the separated individual in the event a redetermination that he has been overpaid is made on later information. The intent of the proposed amendment is to encourage timely filing of separation reports by employers.

Sen. Stand. Comm. Rep. No. 298, in 1968 Senate Journal, at 565.