894 P.2d 80

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Leslie M. OKUMURA, Defendant–Appellant,**

**and**

**Stephen Kona, Defendant.**

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Leslie M. OKUMURA, Defendant–Appellant,**

**and**

**Rogelio Mata, also known as Roger, Defendant–Appellant,**

**and**

**John Doe, Defendant.**

**No. 16365.**

Supreme Court of Hawai'i.

May 4, 1995.

---

Reinette W. Cooper of Cooper and Ireton, Honolulu, for defendant-appellant Leslie M. Okumura.

Mark S. Kawata, Honolulu, for defendant-appellant Rogelio Mata.

Dwight K. Nadamoto, Deputy Pros. Atty., Honolulu, for plaintiff-appellee State of Hawai'i.

Before MOON, C.J., KLEIN, NAKAYAMA and RAMIL, JJ., and WONG, Family Court Judge, In Place of LEVINSON, J., Recused.

KLEIN, Justice.

Following a consolidated jury trial, defendant-appellant Leslie M. Okumura was con-victed of two counts of Burglary in the First Degree and one count of Criminal Conspiracy (to commit burglary), and defendant-appellant Rogelio Mata was convicted of one count of Criminal Conspiracy (to commit burglary). Okumura appeals from his convictions and sentence in No. 16365 and Mata appeals from his conviction and sentence in No. 16415.[1]

For the reasons set forth below, we vacate Okumura's conspiracy conviction and remand for a new trial on that charge, affirm Okumura's burglary convictions but remand for clarification of the record with respect to the circuit court's decision to impose extended terms of imprisonment on Okumura, and affirm Mata's conviction and sentence.

## I. BACKGROUND

According to the prosecution's theory of the case, Okumura and Mata (collectively, the Appellants) were involved in several burglaries in the Hawai'i Kai area. Mata was not alleged to have participated in any of the burglaries but was alleged to have identified homes to burglarize and, as an officer of the Honolulu Police Department (HPD), to have kept his cohorts informed of the police investigations of the burglaries. Okumura, who is a locksmith by trade, allegedly committed the actual burglaries with the assistance of Alvin Morgan, Stephen Kona, and Richard Geffken. Morgan and Kona subsequently entered into plea agreements with the prosecution and testified against Okumura and Mata. Geffken did not participate in the trial in any manner and the record does not reveal the status of the single charge against him.

### Evidence of the Burglaries
#### Parsa Burglary

On January 27, 1990, the Parsa residence was burglarized. Fourteen year old Natalie Parsa was in the residence at the time and called the police to report the burglary.

Morgan testified that he, Okumura, and Kona committed the burglary following a tip from Mata. Okumura entered the residence from a second floor balcony sliding door,

1. The appeals were consolidated under No. 16365 by order dated December 23, 1992.

Morgan acted as a lookout, and Kona drove the getaway car. Mata had told them that no one would be home and that cash and jewelry would be there.

Kona testified that he, Okumura, and Morgan committed the burglary. After the burglary, Mata called and told Kona not to mention his name.

Touri Parsa testified that Mata and her brother were friends and that Mata had met her brother on the driveway of the residence on previous occasions. Among the items taken were $5000 in cash, a gold Rolex watch, jewelry, and a camera.

Okumura denied ever having been to the Parsa residence, but admitted that on one occasion he had bought jewelry and Rolex watches from Morgan. Mata denied any involvement in the Parsa burglary.

### Ihara Burglary

On March 31, 1990, the Ihara residence was burglarized. No one was home at the time but Richard Fukuda, who lived across the street and was the Iharas' attorney, apparently saw some suspicious activity and notified the police of a possible burglary after midnight on the morning of April 1, 1990.

Morgan testified that he, Okumura, and Geffken committed the burglary based on a tip from Mata. Okumura entered the house using a key which he had brought, Morgan entered the house briefly but primarily acted as a lookout outside, and Geffken drove. During the burglary, Okumura called Mata on his cellular phone and told Mata about the burglary and arranged to meet at a Zippy's restaurant later.

Kona was apparently not involved in the actual commission of the Ihara burglary but testified that Mata had wanted the house burglarized and was planning to tell Okumura or Kona when the Iharas would be on vacation.

Mata denied involvement in the burglary but admitted that he had an office above the Iharas' garage and that he had referred Okumura to the Iharas to open a vault. Okumura denied involvement in the burglary but admitted that he had been to the Ihara residence on previous occasions to work on the vault and to fix the door on Mata's office.

### Sano Burglary

On July 15, 1990, the Sano residence was burglarized. The Sanos were out of town on that day and no one was at home when the burglary occurred. Ethel Isara, who was housesitting, discovered the burglary later and called the police.

Kona testified that he and Okumura committed the burglary based on a tip that Okumura had been given. Kona dropped Okumura off and picked him up but was unaware of any of the details of the burglary.

Morgan was apparently not involved in this burglary and did not testify concerning it.

Mata denied any involvement in the burglary but admitted that he knew the Sanos would be out of town because HPD Officer Guy Nahale, the Sanos' son-in-law who resided at the house, had told him to watch the house while they were away. Okumura denied any involvement in the burglary.

### Kobayashi Burglary

On July 18, 1990, the Kobayashi residence was burglarized. Toko Kobayashi and his fiancée were at home at the time, interrupted the burglars, and called the police.

Morgan testified that he, Okumura, and Kona committed the burglary following a tip that Okumura had been given. Okumura entered the house through a rear bedroom window, Morgan acted as a lookout, and Kona drove. After they were discovered, Morgan and Okumura fled on foot. While running away, Morgan dropped a can of mace and Okumura's cellular phone that he had been carrying.

Kona testified that he, Okumura, and Morgan committed the burglary. While Kona was waiting to rendezvous with Morgan and Okumura, he met with Mata who was responding to the burglary report. After Kona picked up Okumura, they returned to the scene to look for Morgan and the cellular phone. While searching, two Japanese men

and a "haole"[2] lady approached the car and shone a light inside. Sometime after the burglary, Kona spoke with Mata who told him not to worry because the description was of a Mexican and not to mention their conversation to anyone.

Kobayashi testified that after discovering the burglary, he saw two people running from his home. Kobayashi pursued them and got close enough to them to get a look at their faces before they jumped a fence and ran away. Later that night, Kobayashi found a cellular phone. Then, Kobayashi saw a suspicious slow-moving car and as it drove by he shined his flashlight in the window. When talking to police later, Kobayashi described the men as one caucasian and one latin or mexican, probably young. Kobayashi knew Mata from a previous burglary when Mata had been an investigating officer and had come to the house.

The cellular phone that Kobayashi found was identified by a Honolulu Cellular employee as belonging to Okumura.

Okumura denied ever having been to the Kobayashi residence but admitted that he lent Morgan his cellular phone and that he knew Morgan and Kona were planning to commit a burglary that night. Mata denied any involvement in the burglary.

### Charges, Plea Agreements, Etc.

About a week after the Kobayashi burglary, Kobayashi was shown photographic arrays that included Okumura and asked if he could identify any of the perpetrators. Kobayashi did not identify anyone because he did not feel confident accusing anyone based on a photograph and did not want to make a mistake. Kobayashi was shown a second photographic array on September 11, 1990, and again refused to make an identification.

The following day, on September 12, 1990, a preliminary hearing was held. During the hearing Kobayashi testified regarding the facts and circumstances surrounding the bur-

glary of his home. He was asked if any of the perpetrators were in the courtroom. At the time, there were about a dozen people in the courtroom: Okumura, Okumura's counsel, Kona, Kona's counsel, a sheriff, the prosecutor, and few other people in the gallery. Okumura, Kona, and their attorneys were all seated at the defense table. Okumura was dressed in green prison fatigues and his feet were shackled. Kona was dressed in civilian clothing and both attorneys were in courtroom attire. When Kobayashi was asked if he could identify any perpetrator in the courtroom, he looked around the courtroom for approximately forty seconds before identifying Okumura. He identified Okumura by name by reading his name off of his prison uniform. He stated that he was 99% sure of the identification.

On September 21, 1990, Okumura and Kona were charged by way of complaint with committing five burglaries including the Kobayashi burglary. The four burglaries other than the Kobayashi burglary are not at issue in the instant appeal.[3] On January 23, 1991, Okumura was indicted for the Ihara, Parsa, and Sano burglaries.

On May 6, 1991, Kona entered into a plea agreement with the prosecution whereby in exchange for his truthful testimony, the prosecution would drop three charges of first degree burglary, Kona would plead guilty to eight counts of second degree burglary, and the prosecution would recommend a sentence of five years probation with no jail time. Morgan also entered a plea agreement with the prosecution. A plea agreement had initially been entered into on September 11, 1990, the day before the aforementioned preliminary hearing, but because Morgan had not had an attorney present, the agreement was renegotiated as of April 18, 1991. Under the terms of the second agreement, in exchange for Morgan's testimony, the prosecution would drop six burglary charges and would not prosecute Morgan for any of the

**2.** Pukui and Elbert's *Hawaiian Dictionary* (rev. ed. 1986) defines "haole" *inter alia* as "[w]hite person, American, Englishman, Caucasian[.]"

**3.** On February 6, 1991, the circuit court granted Kona's motion to sever the two counts of the complaint that did not involve Kona and, on

April 24, 1991, following a jury trial, Okumura was acquitted of those two charges. The remaining two charges were dismissed without prejudice on January 2, 1992, for violation of Rule 48 of the Hawai'i Rules of Penal Procedure.

burglaries involved in the instant case, Morgan would plead guilty to seven counts of second degree burglary, and the prosecution would recommend a five year jail sentence with a two year presentence credit.

On May 15, 1991, Okumura filed a Motion to Suppress Kobayashi's pre-trial identification. On June 17, 1991, a hearing on Okumura's motion was held at which the court took judicial notice of the testimony Kobayashi had given at the preliminary hearing. The court denied the motion, finding that the identification was not impermissibly suggestive and that it was reliable. Written findings of fact and conclusions of law were filed on July 8, 1991.

In the meantime, on May 17, 1991, an amended indictment was filed charging Okumura, Mata, and Geffken with conspiracy to commit burglary in the first degree. The indictment alleged numerous overt acts related to the Parsa, Ihara, Sano, and Kobayashi burglaries.

Prior to trial, the prosecution moved to nolle prosequi the Parsa burglary charge against Okumura. The only charges remaining for trial were the Ihara, Kobayashi, and Sano burglary charges against Okumura and the conspiracy charges against both Appellants.

### The Trial

#### Voir Dire

During voir dire it was revealed that there had been a newscast concerning the Appellants and their alleged involvement in a burglary other than those charged. The court initially agreed to allow individual questioning of prospective jurors who had seen the newscast at the bench. Prospective juror Christopher Ako, however, was subsequently briefly questioned concerning the newscast in the presence of the jury without any objection. Later, the Appellants requested that prospective juror Lisa Ann Yamashiro be voir dired at the bench after she indicated that she might not be able to be fair after having seen the newscast. The court denied the request. Yamashiro was then questioned in front of the jury and described what she had seen in the newscast and the impact that

it had upon her. Yamashiro was subsequently excused for cause.

#### Polygraph Evidence

During cross-examination of Kona, Kona mentioned that the police had given him a polygraph test. The Appellants did not immediately object but later made a motion for mistrial on the ground that the prosecution had violated the discovery rules by failing to disclose the polygraph results. The court denied the motion for mistrial. The Appellants then made a motion to compel discovery of the polygraph results. This motion was also denied.

#### Fukuda's testimony

Following an objection to all testimony from Fukuda on hearsay grounds, the trial court ruled that it would allow Fukuda to identify pictures of the Ihara residence and to testify as to what he knew about the Iharas, that Mata had an office at the Ihara home, that he had reported the burglary, and that he had seen no signs of forced entry. Fukuda subsequently testified within the parameters set by the court and was cross-examined by both defense attorneys.

#### Cross–Examination of Morgan

While Mata's attorney was cross-examining Morgan regarding his plea agreement and numerous past burglaries, which may or may not have been encompassed therein, the prosecuting attorney objected to the line of questioning. The court sustained the objection and outlined parameters of questioning that would be allowed. Within the court's limitations, defense counsel was allowed to extensively question Morgan regarding his criminal background and the plea agreement.

#### Videotape Evidence

While being cross-examined, HPD Detective Craig Tavares claimed that Okumura had offered to implicate a police officer in the burglaries and that Okumura's offer had been recorded on videotape. Because the Appellants had not been given the videotape, the court ordered Detective Tavares to speak with HPD Detective William Chur to find out where the videotape was located. According

to Detective Chur, the videotape was inaudible and had been thrown away. The Appellants moved for a mistrial on the ground that the prosecution had violated the discovery rules by failing to disclose the videotape of Okumura's statements. The court denied the motion but allowed the Appellants to cross-examine Detective Tavares in the presence of the jury about the circumstances surrounding the alleged videotape and the reasons why it was no longer available.

### Motion for Judgment of Acquittal

At the close of all the evidence, Okumura moved for a judgment of acquittal as to the Ihara burglary on the grounds that there was no evidence that Okumura did not have permission to enter the Ihara residence or that any crime had been committed therein. The court denied the motion.

### Jury Instructions

Okumura submitted proposed instructions to tell the jury, *inter alia:* (1) how to evaluate the identification testimony of a witness; (2) how to evaluate the testimony of accomplices and co-conspirators; and (3) that Okumura could not be convicted of both the substantive burglary charges and the conspiracy charge. The court refused all instructions over the Appellants' objections.

### The Verdict

The jury returned verdicts of guilty against Okumura with respect to the Kobayashi and Ihara burglaries as well as to the criminal conspiracy. The jury was unable to unanimously reach a verdict as to the Sano burglary and a mistrial was declared on that charge.

The jury returned a verdict of guilty against Mata on the criminal conspiracy charge.

### Sentencing

Sentencing took place on July 20, 1992. Okumura was sentenced for two counts of burglary in the first degree and one count of criminal conspiracy. A motion for extended terms was made by the prosecution on the basis of five prior convictions for sexual as-

sault and escape and the sophisticated nature of the burglaries. The court found that Okumura was a persistent and multiple offender and, because "criminality was so extensive," granted the motion. Thus, Okumura was sentenced to an indeterminate term of twenty years on each count, to be served concurrently.

## II. DISCUSSION

The Appellants raised several points of error in their briefs and at oral argument before this court. Some arguments were advanced by Okumura, some by Mata, and some by both. We will address the alleged errors in the order that they arose during the circuit court proceedings, identifying the Appellant who raised the issue where appropriate.

### A. Pre-trial identification

■ Okumura contends that his motion to suppress Kobayashi's pre-trial identification should have been granted because the identification procedure at the preliminary hearing was overly suggestive.

When the defendant challenges admissibility of eyewitness identification on the grounds of impermissibly suggestive pre-trial identification procedure, he or she has the burden of proof, and the court, trial or appellate, is faced with two questions: (1) whether the procedure was impermissibly or unnecessarily suggestive; and (2) if so, whether, upon viewing the totality of the circumstances, such as opportunity to view at the time of the crime, the degree of attention, and the elapsed time, the witness'[s] identification is deemed sufficiently reliable so that it is worthy of presentation to and consideration by the jury.

*State v. Decenso,* 5 Haw.App. 127, 131, 681 P.2d 573, 577–78 (1984) (quoting *State v. Tuua,* 3 Haw.App. 287, 289–90, 649 P.2d 1180, 1183 (1982)).

■ Although the circuit court concluded that the procedure was not unnecessarily suggestive and that the identification was sufficiently reliable, the questions of suggestiveness and reliability are questions of law that are freely reviewable on appeal. *Id.*

On the other hand, answering these questions involves determinations of fact by the court. *Id.* "Appellate review of factual determinations made by the trial court deciding pretrial motions in a criminal case is governed by the 'clearly erroneous' standard." *State v. Blake,* 5 Haw.App. 411, 414, 695 P.2d 336, 338 (1985) (citing, *inter alia, Tuua, supra*). "A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." *State v. Miller,* No. 16677, 1995 WL 8083, slip op. at 16 —— Hawai'i App. ——, ——, —— P.2d ——, —— (Haw. App. January 9, 1995), *reconsideration denied,* 77 Hawai'i 501, 889 P.2d 78, *cert. granted,* 78 Hawai'i 421, 895 P.2d 172 (1995).

## 1. *Suggestiveness*

■ The circuit court's findings of fact relevant to whether the procedure was unnecessarily suggestive include the following:

11. At the preliminary hearing, Mr. Kobayashi took a look around the entire courtroom before identifying Defendant Okumura. There were four people seated at the defense counsel's table as well as others seated in the courtroom.

12. Defendant Okumura was dressed in his green Oahu Community Correctional Center outfit and had his feet shackled. A sheriff was also present in the courtroom.

13. When Mr. Kobayashi identified Defendant Okumura, Defendant Okumura was seated next to his attorney, co-defendant Kona and co-defendant Kona's attorney. They were all seated at a table.

Okumura does not specifically challenge any of these findings of fact and none of them appear to be clearly erroneous.[4]

Based on our evaluation of the circumstances surrounding Kobayashi's identification, particularly the fact that Okumura was the only person in the courtroom wearing a prison uniform and shackles, we conclude that the identification procedure was suggestive and that the circuit court erred in ruling otherwise.

## 2. *Reliability*

The prosecution concedes that the fact that Okumura was the only person wearing a prison uniform "may have been suggestive," but contends that Kobayashi's identification was nonetheless sufficiently reliable.

■ The factors to be considered in determining the reliability of an identification include

[t]he opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of the witness'[s] prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and confrontation.

*State v. Mitake,* 64 Haw. 217, 221 n. 3, 638 P.2d 324, 327 n. 3 (1981) (quoting *State v. Padilla,* 57 Haw. 150, 154, 552 P.2d 357, 360 (1976)).

■ The circuit court's findings of fact relevant to the reliability issue include the following:

3. Mr. Kobayashi called the police and as he looked out his window, he saw two men running. He then ran to the street and saw the two men walk out from his neighbor's lot and cross the street.

4. When Mr. Kobayashi go [sic] to approximately six to eight feet from the men,

---

4. Okumura argues that two other "facts" not included in the circuit court's findings of fact support his contention that the identification was impermissibly suggestive: (1) Kobayashi identified him as "Mr. Okumura" by reading his name off of his prison uniform; and (2) Kobayashi had been told before the preliminary hearing that the burglar had been caught. The first fact is of little relevance. Kobayashi only read the name tag after he had physically identified Okumura; there is no indication in the record that Kobaya-

shi knew Okumura or had been told that the suspect was named Okumura. As to the second fact, no evidence regarding that fact was presented at the motion to suppress the pre-trial identification. The fact apparently only came to light during trial and Okumura did not renew his motion to suppress after it was revealed. Therefore, we will not consider the second fact in reviewing the circuit court's denial of the motion to suppress.

he yelled at them and they ran and jumped over a fence into the vacant lot.

. . . .

6. After the police left, Mr. Kobayashi, his fiance [sic], and roommate went to inspect the vacant lot where Mr. Kobayashi had last seen the two men run.

7. At the vacant lot, Mr. Kobayashi saw a car driving very slowly out of the driveway. He shined his flashlight into the car and saw the passenger very clearly. The car's window was down.

. . . .

9. Mr. Kobayashi further testified that he was shown photographic lineups two different times by police detectives, but did not identify anyone because photographs can be misleading.

10. Mr. Kobayashi did not want to identify anyone from a photograph and possibly unjustifiably accuse anyone.

. . . .

16. Mr. Kobayashi also had two opportunities to view Defendant Okumura on the night of the offense and both times was within six to eight feet from the Defendant.

17. Mr. Kobayashi had his flashlight shining into the car when he saw Defendant Okumura the second time that night.

18. Mr. Kobayashi testified that he was ninety-nine percent positive (99%) that Defendant Okumura was the man he saw that night and was concerned about identifying him as he was concerned that Defendant Okumura may go to jail as a result.

Okumura does not specifically challenge any of these findings of fact and none of them appear to be clearly erroneous.

An evaluation of the relevant factors supports the conclusion that the identification was sufficiently reliable for presentation to the jury. Kobayashi had two opportunities to view the suspect, once when the suspect's face was clearly lit with a flashlight. Kobayashi's degree of attention was high as he was chasing the suspects on the first viewing and looking for evidence on the second. The

level of certainty (99%) was high. The length of time between the crime (July 18, 1990) and the confrontation (September 12, 1990) is not particularly significant—it is neither so short as to favor reliability nor too long to raise any serious doubts. The only factor that would tend to indicate unreliability would be the apparent inaccuracy of Kobayashi's description given at the time of the burglary. Kobayashi described the suspects as a latin-looking fellow, a caucasian, and a local-looking, non-Asian. Okumura, on the other hand, is Japanese. Although Kobayashi's description appears inaccurate, a photograph of Okumura reveals that "latin-looking" was fairly descriptive of Okumura's appearance at the time.[5]

Based on the totality of the circumstances, the circuit court properly concluded that Kobayashi's identification was sufficiently reliable. "Thus, the weight of the identification testimony and the credibility of the witnesses were for the jury to determine. The defense counsel could cross-examine the witnesses, point out any suggestibility in the identification procedure, and present countervailing testimony such as alibi." *State v. Masaniai*, 63 Haw. 354, 365, 628 P.2d 1018, 1026 (1981) (citations omitted). Therefore, the circuit court did not err in denying the motion to suppress pre-trial identification.

### B. *Jury taint*

█ "A fair trial by an impartial jury is guaranteed to the criminally accused by both the sixth amendment of the United States Constitution and article I, § 14 of the Hawaii Constitution. Inherent in this requirement is that the jury be free from outside influences." *State v. Williamson*, 72 Haw. 97, 102, 807 P.2d 593, 596 (1991) (citing *State v. Keliiholokai*, 58 Haw. 356, 569 P.2d 891 (1977)). Although both *Williamson* and *Keliiholokai* dealt with outside influences occurring after trial had begun, their admonitions are similarly applicable to outside influences occurring prior to or during jury selection. *See State v. Pokini*, 55 Haw. 640, 643, 526 P.2d 94, 100 (1974) ("Given the quantity,

---

5. When confronted with the photograph of Okumura during oral argument before this court, Okumura's attorney conceded as much, stating:

"Arguably, your Honor, someone might consider that look to be latin."

quality, and timing of this pre-trial publicity, it was incumbent on the trial judge to conduct a thorough-going examination of veniremen who indicated they had been exposed to it."); *State v. Wakinekona*, 53 Haw. 574, 579, 499 P.2d 678, 682 (1972) (stating that issue was "whether the trial judge took sufficient steps [during *voir dire* of prospective jurors] to shield the proceedings from the prejudicial effect of the [pre-trial] publicity").

In the instant case, there are two outside influences to consider. The first is the newscast itself. The second is Yamashiro's account of the newscast and the effect that it had on her that was given in the presence of the jury panel.

■ With respect to the newscast itself, all of the prospective jurors who saw the newscast were questioned and either excused or passed for cause. Thus, any argument that the jury was tainted by the newscast itself is without merit. *Cf. United States v. Jones*, 542 F.2d 186, 193 (4th Cir.) (noting that "[e]ven had there been prejudicial pretrial publicity, [because all eight prospective jurors who had been directly exposed to pretrial publicity had been excused and did not sit on the jury,] it was not thus such as to deny to the defendants the right to be tried by a fair and impartial jury"), *cert. denied*, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375, 376 (1976). Similarly, Okumura's contention that he was limited in his questioning of prospective juror Yamashiro is irrelevant because Yamashiro was excused for cause and did not serve on the jury. Thus, although the "individual examination of potentially tainted jurors [should have been done] outside the presence of other jurors," *Williamson*, 72 Haw. at 102, 807 P.2d at 596, the failure to do so was not, in itself, reversible error.[6]

■ On the other hand, by requiring the questioning of Yamashiro regarding the newscast to take place in the presence of all of the other prospective jurors, the court risked tainting the entire jury panel. The Appellants contend that the jury panel was in

fact tainted by the questioning of Yamashiro. In essence, this is a claim that the questioning of Yamashiro constituted an "outside influence" that tainted the jury.

> Once there is a claim that an accused is being denied his or her right to a fair trial because of outside influences infecting a jury, the initial step for the court to take is to determine whether the nature of the outside influences rises to the level of being substantially prejudicial. If it does not rise to such a level, the trial court is under no duty to interrogate the jury. And whether it does rise to the level of substantial prejudice is ordinarily a question committed to the trial court's discretion.

*Williamson*, 72 Haw. at 102, 807 P.2d at 596 (citation and quotation marks omitted).

In the instant case, after the questioning of Yamashiro, which the Appellants now contend tainted the jury, neither Mata nor Okumura asked the court to excuse the remaining prospective jurors or examine them to determine whether they had been prejudiced by the questioning. Thus, the circuit court was never called upon to make any findings as to whether the questioning of Yamashiro was an outside influence that reached the level of substantial prejudice. We must therefore make an independent examination of what Yamashiro said in the presence of the remaining jurors and determine whether it was substantially prejudicial. *See Keliiholokai*, 58 Haw. at 360, 569 P.2d at 895 (stating that our duty "on review of the actions taken by the trial court on this issue, giving due deference to the trial court's discretion, is to make an independent examination of the totality of the circumstances to determine if there are any indications that the defendant's trial was not fundamentally fair").

The relevant portions of the voir dire of Yamashiro were as follows:

Q. [by prosecuting attorney] In fact, that newscast that you heard, it has nothing to do with this case and you shouldn't even consider it. Can you

---

6. There does not appear to be any particular reason that the court refused to voir dire Yamashiro at the bench, except that doing so would take more time and be somewhat inconvenient.

If the trial judge had simply acquiesced to the defendants' simple request, to which the prosecuting attorney had no objection, this entire issue could have been avoided.

promise me that you will be able to put that newscast, whatever you heard, out of your mind, that newscast, anything else that you may have heard that you think may be concerned with this case and not base your decision upon that, just what is heard in the courtroom?

A. I can try.

Q. Okay. You think that you would be able to do that?

A. Well, all I can do is try because I don't know.

Q. You'll do your best?

A. Right.

. . . .

Q. [by Mata's attorney] All right. And did you watch the whole news account.

A. Yes.

Q. And do you remember who the news reporter was?

A. No. . . . I don't remember him. I just remember, you know, the people they showed. One of them was the lawyer right there, Cooper, and they interviewed that man who had lost— who was burglarized.

Q. Now, so you immediately recognized that that newscast concerned this case, right?

A. Right.

Q. Okay. Did you see Mr. Mata's picture?

A. Yes.

Q. You didn't see my picture?

A. Not that I recall.

Q. Anyway, now, evidently, you were provided with some information by this person that was on T.V., right, that was being interviewed?

A. Yes. I guess so.

Q. Okay. Now, did what you heard lead you to believe that Mr. Mata may be guilty?

A. Personally, yes.

. . . .

Q. . . . Now, you understand that news account didn't give maybe Mr. Mata's side of the story, right?

A. Right.

Q. The news account didn't present the side of the story that may be presented by Leslie Okumura, correct?

A. Right.

Q. Okay. As far as you're concerned, now, having seen that newscast and walking in the court today, do you feel that Mr. Mata could probably be guilty?

A. Yes. Anything is possible.

Q. Okay. Well, forget about possibilities, now. Do you think that he is guilty, having watched that newscast?

A. Well, I think that, because I watched it earlier and I remembered and then I saw it that night, then, it's quite possible.

Q. Quite possible, right. Do you think— now, I noticed that the prosecutor asked you to promise him that you would not take the newscast information into consideration, when you judge this case. You could only tell him that you'll try. All right. I appreciate that, because I think it's an honest answer but what I hear you saying, and tell me if I'm right or if I'm wrong, is that you're not sure you're going to be able to put that newscast information out of your mind when you decide this case, right?

A. Well, it's hard, because, I mean, you can't completely take out something that you've seen, especially it's so recent.

Q. You're answer to the question is yes, then?

A. Yeah.

. . . .

Q. Do you have any problem with the proposition that Mr. Mata is, as he sits here today, presumed innocent?

A. Not really, no.

Q. Not really. Are you qualifying the answer in any way?

A. No.

Q. So, if you had to vote today, you would vote not guilty, right?

A. Yes.

**396**

Q. [by Okumura's attorney] Okay. You saw the telecast on Monday night?

A. Yes.

Q. Did you form any opinion with respect to Leslie Okumura, from the telecast, without telling me what that opinion is?

A. Yeah. I did but I can be wrong.

Q. Okay. If I told you that that telecast that you saw had nothing to do with the charges in this case and the older kind of haole looking guy that talked on T.V. that night—

A. Uh-huh.

Q. —has nothing to do with the charges in this case, would that have an impact on you so that you might not draw any negative inference from the telecast?

A. I think that I still have a little negative, because, you know, even if it was about something else, because he was inferred in the other one, then I might still hold something against him, yes.

All of the jurors who eventually sat on the case were in the courtroom when the above statements were made. The question we need to answer is, considering the totality of the circumstances, whether these statements amounted to an outside influence that could have substantially prejudiced the jurors against the Appellants. Because no facts of the other alleged burglary were given, how Mata and/or Okumura were implicated was not stated, and Yamashiro's opinion as to their culpability was entirely equivocal, we cannot conclude that Yamashiro's statements were "substantially prejudicial." Moreover, we have examined the three days of voir dire that preceded the questioning of Yamashiro and are confident that "[a]lthough the trial judge did not allow questioning of [Yamashiro] out of the presence of the others, the record of the *voir dire* hearing indicates, we think, that the jury selected was one which could consider the case with impartiality."

---

**7.** In 1993, HRPP Rule 16 was amended so that a request by a defendant was not required to initiate the prosecution's duty to disclose.

**8.** Mata had requested the disclosure of, *inter alia*, "[a]ny reports or statements of experts which

---

*Wakinekona,* 53 Haw. at 580 n. 5, 499 P.2d at 682 n. 5.

**C.** *Failure to disclose polygraph test results*

■ Mata next argues that the prosecution violated Hawai'i Rules of Penal Procedure (HRPP) Rule 16(b)(1)(iii) (1983) when it failed to disclose Kona's polygraph examination results and that the trial court therefore erred when it failed to remedy the violation by either granting his motion for mistrial or his motion to compel discovery of the polygraph results.

At the time this case was tried, HRPP Rule 16(b)(1)(iii) required the disclosure, upon request,[7] of:

> any reports or statements of experts, which were made in connection with the particular case or which the prosecutor intends to introduce, or which are material to the preparation of the defense and are specifically designated in writing by defense counsel, including results of physical or mental examinations and of scientific tests, experiments, or comparisons.

Mata essentially contends that a polygraph examination is a "scientific test, experiment, or comparison" within the meaning of HRPP Rule 16(b)(1)(iii), and that the results of the polygraph examination taken by Kona should therefore have been disclosed by the prosecution pursuant to Mata's request.[8] We disagree.

Even assuming that a polygraph examination is a "scientific test" within the meaning of HRPP Rule 16(b)(1)(iii), we do not believe that the prosecution would be required to disclose the results thereof. "Rule 16(b)(iii) ... give[s a defendant] a right to discovery *conditioned on the materiality of the item to the preparation of the defense* [.]" *State v. Montalbo,* 73 Haw. 130, 135, 828 P.2d 1274, 1278 (1992) (emphasis added). Thus, in *Montalbo,* the trial court's order precluding introduction of evidence based on a computer

---

were made in connection with the particular case or which the Prosecutor intends to introduce, including results of physical or mental examinations and of scientific tests, experiments, or comparisons[.]"

program used to analyze DNA evidence compensated for the prosecution's failure to disclose the computer program to the defendant, *id.;* in essence, by making the computer program evidence inadmissible, the trial court eliminated the prosecution's duty to disclose. Accordingly, when the prosecution provided additional discovery regarding the computer program after a continuance of the trial date, the trial court lifted the sanction precluding introduction of evidence based on the computer program. *Id.*

The relationship between the potential admissibility of evidence and the prosecution's duty to disclose is similarly illustrated in *State v. Estrada,* 69 Haw. 204, 738 P.2d 812 (1987). In *Estrada,* we considered the prosecution's duty to disclose two items: (1) a Honolulu Police Department Internal Affairs Division (IAD) file on a police officer whom the defendant was accused of attempting to murder; and (2) certain testing materials used by a psychologist who had evaluated both the defendant and the alleged victim and would be testifying for the prosecution. 69 Haw. at 216–218, 738 P.2d at 821–22. We held that the defendant was entitled to discovery of the IAD file because it contained evidence of prior bad acts of the alleged victim that would be potentially admissible under Hawai'i Rules of Evidence (HRE) Rule 404(b). *Id.* at 217, 738 P.2d at 822. On the other hand, we held that the defendant was not entitled to discovery of the psychologist's testing materials because the materials were "neither relevant nor admissible," and we "fail[ed] to discern what discoverable evidence could have been obtained" therefrom. *Id.* at 218, 738 P.2d at 822.

In the instant case, the issue is whether the prosecution had a duty to disclose the results of Kona's polygraph examination. According to well-established precedent in this jurisdiction, polygraph results are not admissible at trial whether offered by the prosecution or the defense, *State v. Antone,* 62 Haw. 346, 357, 615 P.2d 101, 109 (1980); *State v. Chang,* 46 Haw. 22, 31, 374 P.2d 5, 11 (1962), and we see no way in which the polygraph examination results could have been material to the preparation of the defense.[9] For these reasons, in *Ballard v. Superior Court,* 64 Cal.2d 159, 49 Cal.Rptr. 302, 410 P.2d 838 (1966), the Supreme Court of California upheld a trial court's denial of a defendant's specific request for disclosure of the results of a polygraph examination that a prosecution witness had taken. The court stated:

> Defense counsel failed to offer any tenable reason to the trial court why he should be given the results; moreover, we cannot conceive of their pertinence to defendant's case. Not only is evidence of polygraph tests inadmissible, but the results of the test would neither lead to any additional evidence nor aid petitioner in preparation for trial.

64 Cal.2d at 170–71, 49 Cal.Rptr. at 309, 410 P.2d at 845; *accord Zupp v. State,* 258 Ind. 625, 630, 283 N.E.2d 540, 543 (1972) (quoting *Ballard, supra* ). Therefore, the prosecution did not violate HRPP Rule 16(b)(1)(iii) when it did not disclose the results of Kona's polygraph examination to Mata. Because the prosecution was not obligated to disclose the polygraph examination results, Mata's argument that the trial court erred when it failed

**9.** At trial, testimony regarding the polygraph examination was not intentionally elicited by either the prosecution or the defense but was fortuitously mentioned during Mata's cross-examination of Kona as follows:

> [Mata's Attorney]: And then the statement picks up and says "This is Detective Chur, the following is a continuation of an interview with Stephen Kona, the date is May 8th, 1991, the same day, and the time is now 1935 hours, after a long break." So we're talking about, oh, let's see, that would be about 7:35. So we're talking about, gee, six hours, right?
> [Kona]: Within this break I had to take a polygraph test and stuff.

Mata contends that if the polygraph examination results had been disclosed, Kona's reference to the polygraph examination could have been avoided. We fail to see, however, how disclosure of the polygraph *results* could have prevented Kona's reference to his polygraph examination. Moreover, Kona's plea agreement with the prosecution specifically stated that Kona was required to pass a polygraph, and the plea agreement had been disclosed to Mata. Therefore, Mata was on notice that a polygraph examination would be performed and could have made a motion in limine to prevent any mention of that polygraph examination.

to remedy the alleged HRPP Rule 16 violation is without merit.

Mata's sole argument related to the polygraph evidence seems to be that the trial court erred in failing to remedy the alleged discovery violation; he does not appear to argue that the solitary reference to the polygraph examination at trial is itself a ground for reversal of his conviction based on the prohibition of such evidence established in *Chang, supra,* and *Antone, supra.* Even if we were to construe Mata's argument broadly, on the facts of this case, we would not reverse Mata's conviction as a result of Kona's reference to the polygraph examination.

As in *State v. Landry,* 502 So.2d 281 (La. Ct.App.), *writ denied,* 508 So.2d 63 (La.1987), "the test results [were not] introduced. The record clearly indicates the testimony regarding the test was the result of a witness'[s] non-responsive answer. Moreover, there has been no showing of bad faith on the part of the [prosecution] by attempting to get this information into evidence." 502 So.2d at 289. Under these circumstances, the court in *Landry* concluded that "any error which might have occurred was harmless since no substantial right of the accused was affected." *Id.* Furthermore, although an admonition to the jury to disregard the polygraph reference "could have eradicated or minimized the harmful results" of the testimony, *see Chang,* 46 Haw. at 38, 374 P.2d at 14, because the testimony in this case did not include the results of the polygraph examination and no further mention of the polygraph was allowed, the circuit court's failure to admonish the jury was not error. *Cf. United States v. Wyant,* 576 F.2d 1312, 1319 (8th Cir.1978) ("It would appear that in denying the request [for a cautionary instruction], the Court was attempting to avoid any amplification of jury awareness of what was *almost* stated by the witness, i.e., test results. Therefore, the trial judge minimized any prejudicial effect that the brief unsolicited statement may have had on the jury." (Emphasis in original.)). This is especially so in light of the fact that although the prosecuting attorney twice suggested that Mata move to strike the polygraph reference, Mata did not make such a motion or ask for a cautionary instruction, ostensibly because he felt that "[e]ven a request to strike the remark was inadvisable, as it would only emphasize the point." Mata's Reply Brief at 9.

### D. *Objection to Fukuda's testimony*

The prosecution elicited the following testimony from Fukuda: Fukuda had been Mrs. Ihara's attorney for several years; Mrs. Ihara lived in Japan but maintained a residence in Hawai'i Kai where she stayed "two or three times a year"; Fukuda had seen Mata once before on the premises of the Ihara residence; there was a room at the head of the Iharas' garage with a sign on it that said "Mata Office"; Fukuda had called the police after midnight on April 1, 1990, to report a possible burglary; and Fukuda had seen no signs of forced entry. In addition, Fukuda authenticated several photographs of the Ihara residence. The Appellants argue that Fukuda's testimony should not have been admitted because it was based on hearsay from the Iharas. Hearsay is defined under Hawai'i Rules of Evidence (HRE) Rule 801 as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Because Fukuda did not testify regarding any statements made by the Iharas, there was no direct hearsay testimony.

On the other hand, we have stated that

> [t]estimony based on information supplied by another person that is not in evidence is inadmissible. The rationale is that the witness'[s] knowledge is based on hearsay evidence and the trier of fact is unable to test the source's trustworthiness. This proposition is subject to the regular hearsay exceptions.

*State v. Bannister,* 60 Haw. 658, 659–60, 594 P.2d 133, 134 (1979). Although this passage from *Bannister* suggests that a hearsay objection would be proper, as Professor Bowman explains, "if, as in *Bannister,* the witness fails to mention the hearsay source and simply trumpets the factual data as his [or her] own, then 'lack of personal knowledge' is the technically correct objection, although

the underlying infirmity is in fact reliance on hearsay." Bowman, *Hawai'i Rules of Evidence Manual* § 602–2A, at 207–08 (1990). The rule of evidence requiring witnesses to have personal knowledge is HRE Rule 602, which states in pertinent part that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." According to the commentary to HRE Rule 602, " '[p]ersonal knowledge' for purposes of this rule means that the witness perceived the event about which he [or she] testifies and that he [or she] has a present recollection of that perception."

■ In the instant case, all of the relevant portions of Fukuda's testimony were based on his own perception.[10] Therefore, there was no HRE Rule 602 violation and the circuit court did not err in admitting Fukuda's testimony.

E. *Restricted cross-examination of Morgan*

Mata next argues that his constitutional right to confront witnesses was violated when the circuit court limited his cross-examination of Morgan.

■ Article I, section 14 of the Hawai'i Constitution and the sixth amendment to the United States Constitution guarantee criminal defendants the right to be confronted with witnesses against them. "[I]mplicit in [a] defendant's right to confront witnesses against him, is his right to cross-examine and to impeach the confronted witness." *State v. Napeahi*, 57 Haw. 365, 372–373, 556 P.2d 569, 574 (1976). However, "[t]he right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the trial process." *State v. El'Ayache*, 62 Haw. 646, 649, 618 P.2d 1142, 1144 (1980). Furthermore,

[t]he law is well-settled that the admissibility of evidence, generally, and the scope of

cross-examination at trial are matters exercised within the discretion of the trial court.... The trial court's exercise of its discretion to limit the scope of cross-examination will not be ruled as reversible error when it limits irrelevant and repetitious questions by counsel [and the limitation does] not result in any manifest prejudice to the defendant.

*State v. Young*, 8 Haw.App. 145, 151, 795 P.2d 285, 290 (quoting *State v. Faulkner*, 1 Haw.App. 651, 654–55, 624 P.2d 940, 943–44 (1981)), *cert. denied*, 71 Haw. 669, 833 P.2d 901 (1990). Thus, Mata had a right to cross-examine Morgan, but the scope of that cross-examination could be limited in the exercise of the circuit court's discretion.

The burden of establishing abuse of discretion is on appellant and a strong showing is required to establish it. To constitute abuse, it must appear that the trial court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

*Faulkner*, 1 Haw.App. at 654, 624 P.2d at 943. The question thus becomes whether Mata has established that the circuit court abused its discretion in limiting his cross-examination of Morgan.

■ The cross-examination at issue concerned Morgan's criminal history and the scope of a plea agreement between the prosecution and Morgan, especially with respect to several burglaries that Morgan may have been involved in that were not specifically mentioned in the plea agreement. Mata argues that the cross-examination was relevant because it concerned bias and credibility in that if Morgan would not be prosecuted for numerous previously committed burglaries in exchange for his testimony, he would have a strong motive to fabricate incriminating evidence.

The credibility of a prosecuting witness in a criminal case is always relevant, and cross-examination directed toward reveal-

---

10. The only portion of Fukuda's testimony that may not have been based on his own perception was his testimony that Mrs. Ihara lived in Japan; there is no indication in the record that Fukuda personally perceived Mrs. Ihara living in Japan.

Whether or not Mrs. Ihara lived in Japan, however, was irrelevant to the issue of the Appellants' guilt. Therefore, the admission of that testimony was completely harmless.

ing possible biases, prejudices or ulterior motives of the witness is a proper and important function of the constitutionally protected right of cross-examination.

*State v. Liuafi,* 1 Haw.App. 625, 630, 623 P.2d 1271, 1275 (1981). In *Liuafi,* the Intermediate Court of Appeals (ICA) concluded that "the trial court erred in not allowing the defense to question [a witness] regarding bias." *Id.* In that case, the trial court had precluded the defendant from asking the witness *any* questions regarding the witness's possible financial bias due to a pending civil suit arising out of the same incident that gave rise to the criminal charges. *Id.* at 628–29, 623 P.2d at 1274.

In the instant case, on the other hand, Mata was allowed to elicit the following information from Morgan on cross-examination: prior to 1985, Morgan had been convicted of credit card fraud; in 1985, he pled guilty to one count of burglary in the first degree for the burglary of a hotel room and one count of burglary in the second degree for the burglary of an office building; he was sentenced to concurrent indeterminate terms of imprisonment of ten years and five years; he was placed on parole in 1989 after serving four to five years of his sentence; in 1990 he violated his parole by failing to report to his parole officer; at the time that he was arrested for the parole violation, he was also charged with other offenses because his "girlfriend had a can of mace" and "[t]here was a joint of marijuana on the coffee table"; as a result of the parole violation, he could have been required to serve the remaining five to six years of his original sentence; he informed the parole board that he was cooperating with the police on the instant case and his parole was not revoked; the prosecution had charged him with thirteen counts of burglary; when negotiating for a plea agreement with the prosecution, he offered to testify against the Appellants in hopes of getting the best possible deal; he eventually entered into a plea agreement with the prosecution

whereby in exchange for his testimony in the instant case, the prosecution would (1) drop six of the burglary charges, (2) allow him to plead guilty to the remaining seven charges, all of which were for burglary in the second degree, (3) not request a mandatory minimum term of imprisonment, (4) not request extended term sentences, (5) recommend that he be sentenced to a five-year term of imprisonment with credit given for two years of time served, (6) provide testimony to the paroling authority regarding his cooperation, and (7) not prosecute him "in connection with any other cases other than the 13 about which [he] gave information"; and there were at least six or seven other cases about which he gave information to Detective Tavares.

The only limitation imposed by the circuit court was that Mata was not allowed to ask Morgan whether he (Morgan) had given information to Detective Tavares regarding a few specific burglaries.[11] Under these circumstances, we hold that Mata adequately raised the issue of Morgan's possible bias. *Cf. State v. Estrada,* 69 Haw. 204, 220, 738 P.2d 812, 823 (1987) (holding that any error in not allowing defendant to cross-examine witness to reveal possible bias "was harmless because the bias was brought out"). Therefore, the circuit court's limitation of the cross-examination of Morgan did not violate Mata's right to confront witnesses against him.

### F. *Failure to disclose videotaped interview*

■ At the time this case was tried, HRPP Rule 16(b)(1)(ii) (1983) required the prosecution to disclose, upon request,[12]

any written or recorded statements and the substance of any oral statements made by the defendant, or made by a co-defendant if intended to be used in a joint trial, together with the names and last known

---

11. In his offer of proof following the prosecution's objection to his questioning regarding whether Morgan had given information regarding specific burglaries, Mata's attorney stated that he had records indicating that "Morgan had given information about his involvement in a

number [44 or 64] of different burglaries." However, he also stated that he did not "intend to go over every single one," but "only want[ed] to pick three."

12. *See supra* note 7.

addresses of persons who witnessed the making of such statements.

Mata contends that the videotape of Okumura's interview was a recorded statement of a co-defendant that should have been disclosed pursuant to this rule. The record indicates, however, that the prosecution did not intend to use the statement in the trial; rather, the statement was fortuitously revealed when Okumura's attorney was cross-examining Officer Tavares. Under the plain language of the rule, when statements of a co-defendant are at issue, only those statements that the prosecution intends to use must be disclosed. Thus, there was no violation of HRPP Rule 16(b)(1)(ii) when the prosecution did not disclose to Mata the videotape of Okumura's interview.

Even if the prosecution had violated HRPP Rule 16(b)(1)(ii), the circuit court took appropriate measures to alleviate any prejudice. We have long recognized that "violation of Rule 16 does not warrant an immediate declaration of a mistrial by the trial court." *State v. Sugimoto*, 62 Haw. 259, 262, 614 P.2d 386, 389 (1980). "In exercising its broad discretion as to sanctions, the trial court should take into account the reasons why the disclosure was not made, the extent of prejudice, if any, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances." *State v. Moriwaki*, 71 Haw. 347, 355, 791 P.2d 392, 396 (citation and quotation marks omitted), *reconsideration denied*, 71 Haw. 665, 833 P.2d 900 (1990).

The ICA addressed a similar situation in *State v. Kaiu*, 5 Haw.App. 350, 692 P.2d 1166 (1984) (involving the prosecution's failure to disclose first report of witness and first report of police officer, which reports were subsequently unavailable at trial).[13] Here, as in *Kaiu*, "there is no suggestion or indication in the record that the prosecution acted maliciously, egregiously, or in bad faith and the trial court did not so find and conclude." 5 Haw.App. at 355, 692 P.2d at 1170. On the other hand, the actions of the circuit court indicate that it felt that there may have been some prejudice to Mata. The court's actions further indicate that it believed the prejudice could be cured by measures less severe than a mistrial. In *Kaiu*, the ICA found that there was no abuse of discretion where "the trial court allowed defense counsel to call or recall all of the relevant individuals as witnesses to question them about the matters ... and to discuss those matters in argument to the jury." *Id*. Similarly, in the instant case, the circuit court allowed defense counsel to recall Detective Tavares and question him about the missing videotape.[14] Thus, the circuit court took appropriate measures to alleviate any prejudice caused by Detective Tavares's testimony regarding the undisclosed statement.

■ Citing *State v. Matafeo*, 71 Haw. 183, 787 P.2d 671 (1990), Mata further claims that he was denied a "meaningful opportunity to present a complete defense" in violation of the due process guarantees of the United States and Hawai'i Constitutions. In *Matafeo*, we explained that "the suppression by the prosecution of evidence favorable to the accused violates due process where the evidence is material to guilt or punishment, regardless of the good faith or bad faith of the prosecution." 71 Haw. at 185, 787 P.2d

---

**13.** The ICA's opinion in *Kaiu* contains an excellent analysis of what a trial court should do when a defendant alleges that the State violated its duty to disclose material and information under HRPP Rule 16. *See Kaiu*, 5 Haw.App. at 354–55, 692 P.2d at 1170.

**14.** The following colloquy occurred at trial:
THE COURT: ... Pursuant to the Court's order, I asked Mr. Tavares to leave the Court and to inform Officer Chur of certain items, and he's back to report. I'm going to turn this matter over to [Mata's attorney].
[Mata's attorney]: Your Honor, I would like to do it in the presence of the jury.
THE COURT: All right, you can bring them in.

[Prosecuting Attorney]: Your Honor, they're objecting to any information about any prior statement, and they want to put it in front of the jury?
THE COURT: It's up to you. I'm willing to do whatever, because the statement made by Mr. Tavares as to what Mr. Okumura said was in the presence of the jury. All right. And there was a motion made earlier by [Okumura's attorney] asking for a mistrial or whatever it is.
[Prosecuting Attorney]: As long as counsel for Defendant Okumura is agreeing to this.
[Okumura's attorney]: That's fine. I want it on the record, because he said there was a tape out there.

at 672 (citing *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963)). However, in order to establish a *Brady* violation, an appellant must make a "showing that the [suppressed] evidence would 'creat[e] a reasonable doubt about the Appellant's guilt that would not otherwise exist.'" *Id.* at 186, 787 P.2d at 673 (quoting *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976)). In the instant case, the record suggests that the undisclosed evidence incriminated Mata and would do nothing to create a reasonable doubt as to his guilt. Thus, Mata has failed to make the necessary showing to establish a *Brady* violation.

■ On the other hand, because the videotape is no longer available, whether the evidence would be exculpatory cannot be conclusively established. Nonetheless, under the United States Constitution, "[w]here the state destroys evidence that has only a potential exculpatory value, due process is not offended unless the defendant can demonstrate that the state acted in bad faith." *Matafeo*, 71 Haw. at 187, 787 P.2d at 673 (citing *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), *reh'g denied*, 488 U.S. 1051, 109 S.Ct. 885, 102 L.Ed.2d 1007 (1989)). In the instant case, there is no evidence that the prosecution acted in bad faith. Therefore, Mata has failed to establish a violation of the *Youngblood* rule.

■ Under the Hawai'i Constitution, however, we recognize that "regardless of good or bad faith, the State may lose or destroy material evidence which is 'so critical to the defense as to make a criminal trial fundamentally unfair' without it." *Matafeo*, 71 Haw. at 187, 787 P.2d at 673 (quoting *Youngblood*, 488 U.S. at 61, 109 S.Ct. at 339 (Stevens, J., concurring)). In the instant case, we cannot conclude that the videotape of the Detective Tavares's interview with Okumura was such a critical piece of evidence. Thus, the prosecution's failure to preserve and produce the videotape did not violate Mata's right to due process under the Hawai'i Constitution.

### G. Sufficiency of the evidence as to the Ihara burglary

■ Okumura next argues that there was insufficient evidence to support his conviction of the Ihara burglary because the prosecution presented no evidence that he did not have permission to enter the Ihara residence, and that his motion for judgment of acquittal made at the close of the evidence should therefore have been granted. Mata joins in the argument on the basis that the circuit court's failure to grant Okumura's motion for judgment of acquittal as to the Ihara burglary prejudiced Mata because Mata indisputably had ties to the Iharas and Okumura.

HRS § 708–810(1)(c) (1985) sets forth the elements of burglary in the first degree as follows:

(1) A person commits the offense of burglary in the first degree if he intentionally enters or remains unlawfully in a building, with intent to commit therein a crime against a person or against property rights, and:

(c) He recklessly disregards a risk that the building is the dwelling of another, and the building is such a dwelling.

HRS § 708–800 (Supp.1992) further states in pertinent part that "[a] person 'enters or remains unlawfully' in or upon premises when he [or she] is not licensed, invited, or otherwise privileged to do so." Thus, in order to convict Okumura of the Ihara burglary, the prosecution was required to prove that Okumura lacked permission to enter.

The Appellants' position appears to be that the prosecution could not prove lack of permission without presenting direct evidence from the Iharas that they did not give Okumura permission to enter their Portlock residence. However,

[i]t is well settled in this jurisdiction that guilt may be proved beyond a reasonable doubt on the basis of reasonable inferences drawn from circumstantial evidence. No greater degree of certainty is required where a conviction is based solely on circumstantial evidence rather than on direct evidence.

*State v. Simpson,* 64 Haw. 363, 373 n. 7, 641 P.2d 320, 326 n. 7 (1982) (citations omitted). Moreover, on appellate review,

> [w]e have long held that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was tried before a judge or a jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.... "Substantial evidence" as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

*State v. Pone,* 78 Hawai'i 262, 265, 892 P.2d 455, 458 (1995) (quoting *State v. Batson,* 73 Haw. 236, 248–49, 831 P.2d 924, 931, *reconsideration denied,* 73 Haw. 625, 834 P.2d 1315 (1992)).[15]

In the instant case, evidence was presented from which a reasonable trier of fact could infer that Okumura did not have permission to enter the Ihara residence. Kona testified that while having lunch at a Zippy's restaurant in February 1990 with Okumura and Mata, Mata told them that he wanted the house where he had an office to be burglarized and Mata and Okumura planned the burglary; other evidence in the record clearly established that Mata had an office on the premises of the Ihara residence. Morgan testified regarding the details of the burglary including the following: in late March 1990,

Morgan met with Okumura and Geffken at Okumura's place of business; Okumura told them that Mata had given him a tip on a house; Geffken drove them to the Ihara residence and dropped off Okumura and Morgan there; Okumura gave Geffken a pager and told him to wait until paged and then pick them up at a designated location; as Morgan and Okumura were going up the driveway, Okumura "pulled out two walkie-talkies from his back pack, he handed [Morgan] one, told [Morgan] to stay [there] and just give him one radio call if anybody came up"; Morgan took a position in the bushes along the driveway where he could see if anyone were coming while Okumura proceeded to the house; Okumura radioed Morgan on the walkie-talkies and told him that no one was in the house; Morgan and Okumura entered the house through a door in the garage; Okumura told Morgan "to go back outside and make sure nobody came up"; Okumura came out of the house with some jewelry and some cash; Morgan and Okumura climbed onto the roof to wait for the Iharas to return because there were supposed to be more valuables in the house; while on the roof, Okumura "mentioned something about escape routes, so [Morgan] went down to the mountain and looked around for ways to take a quick exit"; Okumura and Morgan later went to the location where Geffken was supposed to pick them up and hid in the bushes there until Geffken arrived. In addition, Morgan testified that Mrs. Ihara had not given him permission to enter.

Although there was no direct evidence that Okumura did not have permission to enter,[16]

---

15. Although different language is sometimes used to describe the standard of review when the denial of a motion for judgment of acquittal is appealed, *see Pone,* 78 Hawai'i at 264–65, 892 P.2d at 457–58, the test on appeal is actually identical—if there was sufficient evidence to support the conviction, the motion for judgment of acquittal was properly denied; if there was insufficient evidence, the denial of the motion was error.

16. When being cross-examined by the prosecuting attorney, Okumura managed to avoid answering the question:
Q. You said you never went in the Iharas' home on March 31, 1990?
A. Absolutely not.
Q. So you never had permission to go in there?
A. In 1990?
Q. March 31st.
A. The Ihara house?
Q. March 31, 1990, you had no permission to go into the Ihara house, yeah?
A. You mean to fix the safe?
Q. On March 31, 1990—
A. I can't recall the date.
Q. You heard Alvin Morgan testify?
A. Yes, I did.
Q. You didn't go in there with him?
A. No, absolutely not.

in light of the evidence of the surreptitious manner in which Okumura approached, entered, and left the Ihara residence and the testimony that the burglary was planned in advance, a reasonable mind could infer that Okumura did not in fact have permission from the Iharas. Thus, considering the evidence in the light most favorable to the prosecution, we conclude that the circuit court did not err in denying Okumura's motion for judgment of acquittal.

## H. Identification instructions

■ Okumura argues that the circuit court erred when it refused to give his requested instructions regarding identification [17] because the reliability of Kobayashi's identification of him was a key issue in the case and the requested instructions would have assisted the jury in correctly assessing Kobayashi's identification.

"The giving of special instructions on identification has been regarded as within the discretion of the trial judge or superfluous in the light of adequate general instructions." State v. Padilla, 57 Haw. 150, 162, 552 P.2d 357, 365 (1976); accord State v. Pahio, 58 Haw. 323, 332, 568 P.2d 1200, 1206 (1977). In Pahio, the defendant had requested a jury instruction virtually identical to Okumura's

---

17. Okumura's requested jury instruction no. 7 stated:

One of the issues in this case for your resolution is whether Defendant Leslie M. Okumura was, in fact, the person who committed the acts testified to by the State's witnesses.

In determining this issue you should consider all of the facts and circumstances of the case including not only the testimony of any witnesses which may bear directly upon the issue of the identity of the perpetrator of the acts, if any, which you find were done, but all of the testimony and circumstances bearing upon such identification. An eyewitness identification must be based upon memory and senses of the identifying witness, and the suggestion of other persons.

The burden of proof is upon the prosecution to prove beyond a reasonable doubt the identity of the defendant as the perpetrator of the alleged offenses.

Okumura's requested jury instruction no. 8 stated:

One of the most important issues in this case is the identification of Defendant Leslie M. Okumura as the perpetrator of the alleged offenses. The prosecution has the burden of proving identity beyond a reasonable doubt. It is not essential that the witness himself be free from doubt as to the correctness of his statement. However, you, the jury, must be satisfied beyond a reasonable doubt of the accuracy of the identification of Mr. Okumura before you may convict him. If you are not convinced beyond a reasonable doubt that Mr. Okumura was the person who committed the crime, you must find him not guilty.

Identification testimony is an expression of belief or impression by the witness. Its value depends on the opportunity the witness has to observe the offender at the time of the offense and to make a reliable identification later.

In appraising the identification testimony of a witness, you should consider the following:

1. Are you convinced that the witness had the capacity and an adequate opportunity to observe the offender?

Whether the witness had an adequate opportunity to observe the offender at the time of the offense will be affected by such matters a [sic] how long or short a time was available, how far or close the witness was, how good were lighting conditions, whether the witness had an occasion to see or know the person in the past.

2. Are you satisfied that the identification made by the witness subsequent to the offense was the product of the witness's own recollection? You may take into account both the strength of the identification, and the circumstances under which identification was made.

If the identification by the witness may have been influenced by the circumstances under which the Defendant was presented to the witness for identification, you should scrutinize the identification with great care. You may also consider the length of time that lapsed between the occurrence of the crime and the next opportunity of the witness to see Defendant, as a factor bearing on the reliability of the identification.

You may also take into account that an identification made by picking the Defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the Defendant alone to the witness.

3. Finally, you must consider the credibility of each identification witness in the same way as any other witness, consider whether the witness is truthful, and consider whether the witness had the capacity and opportunity to make a reliable observation on the matter covered in the witness's testimony.

I again emphasize that the burden of proof on the prosecution extends to every element of the crime charged, and this specifically includes the burden of proving beyond a reasonable doubt the identity of the Defendant as the perpetrator of the offense with which he stands charged. If, after examining the testimony, you have reasonable doubt as to the accuracy of the identification, you must find Mr. Okumura not guilty.

requested jury instruction no. 8. *Compare* 58 Haw. at 331 n. 7, 568 P.2d at 1206 n. 7 *with supra* note 17. The trial court refused Pahio's requested instruction and merely instructed the jury that "[i]dentity of the defendant as the person who committed the crime must be proved beyond a reasonable doubt. Such identity may be proved by circumstantial evidence." *Pahio,* 58 Haw. at 331–32 & n. 8, 568 P.2d at 1206 & n. 8. This court held that the trial court did not abuse its discretion when it refused to give Pahio's requested instruction because "[t]he defense counsel's opening statement to the jury, his cross-examination of the prosecution witnesses and the general instruction given by the trial judge adequately directed the jury's attention to the identification evidence and made defendant's requested instruction unnecessary." *Id.* at 332, 568 P.2d at 1206. In *Padilla,* we similarly held that the trial court acted within its discretion when it refused special identification instructions requested by Padilla because "the cross-examination of the prosecution witnesses, the arguments to the jury, and the general instructions given by the court adequately directed the jury's attention to the identification evidence and made unnecessary the more specific instructions requested by the defendant." 57 Haw. at 162, 552 P.2d at 365.

Thus, in order to determine whether the circuit court abused its discretion, we must examine all aspects of the trial, including the opening statements, the cross-examination of prosecution witnesses, the arguments to the jury, and the general instructions given by the court, to determine whether the jury's attention was adequately drawn to the identification evidence.

In the instant case, Okumura's attorney brought up the reliability of Kobayashi's identification during opening statement. In addition, Kobayashi was thoroughly cross-examined by counsel for both Appellants regarding the facts and circumstances surrounding both his opportunity to view the perpetrator at the time of the burglary and

his identification of Okumura at the preliminary hearing. Finally, the circuit court gave general instructions on judging witnesses' credibility and the prosecution's burden of proof, and specifically instructed the jury not to draw any inference of guilt from evidence that Okumura was presented to Kobayashi in a photographic array. Under these circumstances, we believe that the jury's attention was adequately drawn to the identification issue. Therefore, the circuit court did not err in refusing to give Okumura's requested instructions regarding identification witnesses.

I. *Accomplice/co-conspirator witness instruction*

Okumura next argues that the circuit court erred in refusing to give special instructions regarding the testimony of alleged accomplices or co-conspirators.[18] The instruction requested by Okumura stated:

> The testimony of an accomplice should be scrutinized and acted upon with special care and great caution. *No defendant should be convicted on uncorroborated testimony of an accomplice.*
>
> Uncorroborated testimony is testimony which has no basis other than the testimony of a person, either charged or uncharged, who is or who is alleged to be an accomplice of another in the commission of a crime.
>
> Likewise, you are advised that the testimony of an alleged co-conspirator is to be acted upon by you with special care and great caution.

(Emphasis added.)

▪ The emphasized portion above is an incorrect statement of the law—corroboration of the testimony of an accomplice is not required to convict. *State v. Lincoln,* 3 Haw. App. 107, 118, 643 P.2d 807, 815 (1982). Therefore, it was not error for the circuit court to refuse to give the requested instruction. *State v. Riveira,* 59 Haw. 148, 154, 577

---

**18.** As explained in *State v. Chang,* 46 Haw. 22, 374 P.2d 5 (1962), "for purposes of applying the pertinent rules of evidence any coconspirator called as a witness must be considered an accomplice." 46 Haw. at 44, 374 P.2d at 17.

Therefore, in this discussion, we will refer to special jury instructions regarding the testimony of witnesses who are (or are alleged to be) either accomplices or co-conspirators collectively as "accomplice witness instructions."

P.2d 793, 797 (1978) ("If a proffered request is in any respect incorrect, the denial of such a request is not error.").

On the other hand, if instructions are necessary in order for the jury to "have a clear and correct understanding of what it is that they are to decide" and the instructions requested by the parties are "inaccurate or incomplete instructions, 'the trial court has a duty to, with the aid of counsel, either correct the defective instruction or to otherwise incorporate it into its own instruction.'" *State v. Kupau,* 76 Hawai'i 387, 395, 879 P.2d 492, 500 (1994) (quoting *State v. Feliciano,* 62 Haw. 637, 643, 618 P.2d 306, 310 (1980) and *Briones v. State,* 74 Haw. 442, 473, 848 P.2d 966, 980 (1993) (Levinson, J., concurring)) (emphasis omitted); *accord Riveira,* 59 Haw. at 155, 577 P.2d at 797.

Thus, the question in the instant case becomes whether accomplice witness instructions were necessary for the jury to have a clear and correct understanding of what they had to decide. In other words, the question is whether the court's failure to give a proper accomplice witness instruction constituted plain error. *See id.* at 393, 879 P.2d at 498.

In *State v. Chang,* 46 Haw. 22, 374 P.2d 5 (1962), this court purported to establish a rule of general application with respect to the need for accomplice witness instructions. We stated:

> [B]eyond question, a cautionary instruction is in order whenever an accomplice called by the prosecution gives testimony of significant weight and importance in proof of the charge, and ... it is error to refuse a request for such an instruction when an accomplice testifies.

46 Haw. at 43, 374 P.2d at 17. Thus, we held that it was "error for the trial court, whatever its reasoning may have been, to have refused to give [the defendant's] requested [accomplice witness] instruction either in the form as requested or in such modified form

as may have been deemed more suitable to the court." *Id.* at 44, 374 P.2d at 17.

If we were to rely solely on this language from the *Chang* opinion, we might feel compelled to hold that the circuit court erred when it failed to give an accomplice witness instruction. However, as this court explained in *Columbia Casualty Co. v. Hoohuli,* 50 Haw. 212, 437 P.2d 99 (1968),

> [b]lind adherence to legal rules constitutes an abrogation of the judicial function. Such blind adherence may result as much from adoption of a rule without adequate analysis as from application of a precedent without examination of its claim to validity. Legal rules should result from, rather than be a substitute for, legal analysis. Judicial rumination of ideas in a multitude of factual circumstances gives birth to rules. And continued rumination insures that such rules will be applied only as long as they serve the function for which they were designed.

50 Haw. at 217, 437 P.2d at 104.

The instant case presents factual circumstances significantly different from those considered in *Chang* and gives us an opportunity for "continued rumination" as to the need for accomplice witness instructions.

The primary impetus for giving accomplice witness instructions is that

> [t]he standard tests for judging the truthfulness of witnesses generally may too often be inadequate for proper appraisement of an accomplice's testimony.... It is important therefore that jurors, who may not be aware of the reason for the special caution, be alerted for proper consideration of the testimony of an accomplice.

*Chang,* 46 Haw. at 40, 374 P.2d at 15.[19]

The reason for the special caution was discussed in *People v. Fowler,* 196 Cal.App.3d 79, 241 Cal.Rptr. 571 (1987):

> The historical reason for the rule requiring a cautionary instruction when an accomplice testifies as a witness for the

---

19. Special instructions regarding identification testimony of a witness, such as Okumura's requested jury instruction no. 8, *see supra* note 17, similarly may be given to assist the jury in deciding how to evaluate certain testimony. As discussed in section II.H, *supra,* the giving of special identification instructions is within the discretion of the trial court, and an abuse of discretion will be found only if the opening statements, cross-examination of prosecution witnesses, closing arguments, and other instructions to the jury fail to adequately alert the jury to the issue.

[prosecution] is that the evidence is coming from a tainted source. The source is tainted both because of the accomplice's participation in the crime and because he is usually testifying in the hope of favor or the expectation of immunity. Hence he is not entitled to the same consideration as the evidence of a clean man, free from infamy.... Accomplice testimony is suspect because, like hearsay, it too may be unreliable. Experience has shown that the evidence of an accomplice should be viewed with care, caution and suspicion because it often comes from a tainted source and is often given in the hope or expectation of leniency or immunity. In addition to being derived from a suspect source accomplice testimony is frequently cloaked with a plausibility which may interfere with the jury's ability to evaluate its credibility.

196 Cal.App.3d at 86–87, 241 Cal.Rptr. at 575 (citations and quotation marks omitted); *accord Price v. State*, 647 P.2d 611, 615 (Alaska App.1982); *see also People v. Holmes*, 141 Ill.2d 204, 242, 152 Ill.Dec. 268, 285, 565 N.E.2d 950, 967 (1990) ("The testimony of an accomplice witness 'has inherent weaknesses, being testimony of a confessed criminal and fraught with dangers of motives such as malice toward the accused, fears, threats, promises or hopes of leniency, or benefits from the prosecution.'" (Quoting *People v. Hermens*, 5 Ill.2d 277, 285, 125 N.E.2d 500, 504–05 (1955).)); *Murphy v. Commonwealth*, 652 S.W.2d 69, 72 (Ky.1983) ("The credibility of an accomplice is suspect because he is an admitted criminal and also because his testimony may be influenced by the hope of advantageous treatment of his case."), *cert. denied*, 465 U.S. 1072, 104 S.Ct. 1427, 79 L.Ed.2d 751 *reh'g denied*, 466 U.S. 945, 104 S.Ct. 1933, 80 L.Ed.2d 478 (1984).

On the other hand, "it is not the function of a trial justice to act as advocate for either the prosecution or the defense. Counsel are given adequate opportunities to argue matters of credibility, including bias, motivation, anticipated benefits, or rewards." *State v. Marrapese*, 583 A.2d 537, 545–46 (R.I.1990). Consequently, some jurisdictions disfavor accomplice witness instructions. *See, e.g., McLean v. State*, 638 N.E.2d 1344, 1348 (Ind.Ct.

App.1994) ("Such an instruction would have an unduly disparaging effect on the testimony of the defendants' accomplices, and for this reason, the refusal to give it was proper." (Quoting *Morgan v. State*, 275 Ind. 666, 673, 419 N.E.2d 964, 968–69 (1981).)); *State v. Rubio*, 110 N.M. 605, 607, 798 P.2d 206, 208 (Ct.App.), *cert. denied*, 110 N.M. 641, 798 P.2d 591 (1990).

Furthermore, a number of other jurisdictions, although not affirmatively disfavoring accomplice witness instructions, do not require their trial courts to give them. *Marrapese*, 583 A.2d at 545 ("[W]e have consistently taken the position that it is not necessary for the trial justice to give an accomplice instruction to the jury."); *Commonwealth v. Griffith*, 404 Mass. 256, 265, 534 N.E.2d 1153, 1159 (1989) ("In this Commonwealth a 'judge is not required to give a cautionary instruction to the jury' on accomplice credibility." (Quoting *Commonwealth v. Watkins*, 377 Mass. 385, 389, 385 N.E.2d 1387, 1390, *cert. denied*, 442 U.S. 932, 99 S.Ct. 2866, 61 L.Ed.2d 301 (1979).)); *State v. Smith*, 461 A.2d 1074, 1076 (Me.1983) ("It is not error to refuse to give a cautionary instruction concerning the testimony of an accomplice when that testimony 'is not incredible or otherwise insubstantial on its face.'" (Quoting *State v. Porter*, 404 A.2d 590, 595 (Me.1979).)); *see also United States v. Carr*, 5 F.3d 986, 992 (6th Cir.1993); *United States v. Newton*, 891 F.2d 944, 949 (1st Cir.1989) ("As this court has noted before, although an accomplice witness instruction is advisable when there is accomplice testimony, its absence does not require reversal.").

In *Chang, supra*, this court recognized that "[t]he great likelihood of a self-serving purpose or motive being present whenever an accomplice testifies requires that every accomplice's testimony be approached with suspicion." 46 Haw. at 40, 374 P.2d at 15. The court, however, gave scant consideration to the unduly disparaging effect that an instruction to the jury simply telling them to view a particular witness's testimony with suspicion or the like (e.g., with "great cau-

tion," "special care," or "strictest scrutiny") could have.[20]

██ After "continued rumination," we do not feel that "it would be an abuse of discretion to refuse a request for a cautionary instruction *in any case* where the testimony of an accomplice substantially aids the prosecution's proof." *Chang*, 46 Haw. at 42, 374 P.2d at 16 (emphasis added). Accordingly, we overrule *Chang* to the extent that it so held. Rather, we believe that in some cases in which the testimony of an accomplice substantially aids the prosecution's proof, a trial court may act properly within its discretion if it refuses or otherwise fails to give an accomplice witness instruction.

██ In deciding whether to give an accomplice witness instruction we believe the trial court must consider the need for such an instruction in light of the evidence presented regarding the witness's possible motives to fabricate, particularly the cross-examination of the accomplice witness, as well as the opening statements and arguments made by counsel, and weigh that against the disparaging effect that the giving of an accomplice witness instruction could have. Other relevant factors should also be considered by the trial court.[21]

██ Ultimately, on appellate review, we must examine all aspects of the trial, including the opening statements, the cross-examination of the accomplice witnesses and other evidence presented, the arguments to the jury, and the general instructions given by the court, to determine whether the jury's attention was adequately drawn to the possible motives that the accomplice witnesses may have had to testify falsely. If so, then the circuit court failure to give an accomplice witness instruction will not constitute an abuse of discretion.

██ This test is not necessarily inconsistent with the result reached in *Chang, supra.* In *Chang*, the defendants were charged with conspiracy to commit the offense of gross cheat with the intent to defraud the City and County of Honolulu by submitting fraudulent claims for payment for incontinent pads that were supposed to have been delivered to Maluhia Hospital. 46 Haw. at 23, 374 P.2d at 7. The assistant administrator and the budgetary accountant of the hospital testified for the prosecution. *Id.* at 25, 374 P.2d at 8. From their testimony, it was "apparent that they willingly and knowingly participated in

20. "The purpose of an accomplice instruction, is to assure that the jury realizes that an admitted accomplice's testimony may be affected by the hope of a favor or conversely by the fear of reprisal from the government and considers this factor in weighing such person's testimony." *United States v. Beasley*, 519 F.2d 233, 243 (5th Cir.1975), *vacated on other grounds*, 425 U.S. 956,. 96 S.Ct. 1736, 48 L.Ed.2d 201 (1976). Instructions that simply tell the jury to be suspicious of an accomplice's testimony do not ensure that jurors will properly consider the factors that could be influencing the testimony. Indeed, if an instruction that does not delineate those factors is given, jurors might discredit a truthful accomplice witness simply because of the instruction, even though the jurors may not have thought that the witness's testimony was affected by the hope of a favor or by the fear of reprisal from the government. Therefore, if accomplice witness instructions are to be given in any particular case, we encourage the trial court, with the assistance of counsel, to craft accomplice witness instructions that do more than simply tell the jury to be suspicious of the accomplice's testimony.

21. For example, when multiple defendants are alleged to have been accomplices or co-conspirators and are jointly tried, and one or more of the

codefendants testifies at trial, as in the instant case, it may be inadvisable to give an accomplice witness instruction. In *Taylor v. State*, 403 So.2d 585 (Fla.Dist.Ct.App.1981), the court explained that "[t]he accomplice instruction is not appropriate where defense testimony has been given by ... one of two defendants tried jointly. When it is employed in such a situation, doubt and suspicion are improperly cast upon one defendant's exculpatory testimony on his own or his codefendant's behalf...." 403 So.2d at 586 (citation omitted). The rules governing the giving of accomplice witness instructions in joint trials in California similarly indicate that such instructions are generally disfavored when one or more codefendants testify:

When one of several defendants takes the stand to confess his own guilt and incriminates his codefendants, the accomplice instruction should be given. If, however, each of several defendants testifies in his own defense and none is called as a witness for or against the others, the instructions are not appropriate. Even where one defendant denies participation and incriminates another, the instruction should not be given.

*Fowler*, 196 Cal.App.3d at 86, 241 Cal.Rptr. at 575 (quoting *People v. Sawyer*, 256 Cal.App.2d 66, 73, 63 Cal.Rptr. 749, 753 (1967)).

the irregular processing orders for bed pads and that their cooperation in that connection was instrumental and necessary for accomplishment of the fraudulent scheme alleged in the indictment." *Id.* at 43–44, 374 P.2d at 17. However, neither witness was "charged or named in the indictment as coconspirators[.]" *Id.* at 43, 374 P.2d at 17. In addition, there is no indication in the opinion in *Chang* that the witnesses had entered into plea agreements with the prosecution, or, if so, that any such plea agreements were made known to the jury. Finally, there is nothing in the opinion to suggest that the witnesses' possible motives to testify falsely had been made known to the jury by way of opening statements, cross-examination, closing arguments, or other jury instructions. Given such a record, we would have to agree that the trial court's failure to give the requested accomplice witness instruction in *Chang* was an abuse of discretion.

In the instant case, on the other hand, the record is replete with references to the motives that Kona and Morgan may have had to provide false testimony. The references be-

gan during jury selection[22] and continued during opening statements.[23] When Kona and Morgan took the stand, the prosecution questioned them about their respective plea agreements and their reasons for testifying. Both Appellants then engaged in lengthy cross-examination of both Kona and Morgan on this issue, obviously for the purpose of drawing the jury's attention to their motives for providing false testimony. Finally, the jury instructions that were given included an instruction that "[i]n evaluating the weight and credibility of a witness'[s] testimony, you may consider ... the witness'[s] interest, if any, in the result of this case; ... the witness'[s] ... bias, if any has been shown; ... and all other circumstances surrounding the witness and bearing upon his or her credibility."[24] Thus, "[t]he jury was thoroughly informed of the accomplices' background, relationship to the government and motive for testifying as government witnesses. The omission of a single specific instruction that the jury weigh such testimony with care was not plain error." *Beasley,* 519 F.2d at 243. *See also United States v. Buljubasic,* 808

---

**22.** For example, Mata's attorney's voir dire of one prospective juror included the following:

> Q. [D]id you hear the questions that we were asking about the fact that the State's key witness may have been compensated in some way, maybe not with money but with leniency or deal or plea agreement or something like that. All right. Will you take that into consideration in deciding whether the witness is credible or not?
> A. I'm not supposed to but then I might.
> Q. You can do anything you want on that. You understand that the witnesses might have certain motives, yeah?
> A. Yeah.
> Q. For testifying a certain way, right?
> A. Yes.
> Q. And that a witness, if he gets something, let's say that a witness is supposed to be charged in the case and he gets a deal where he gets off. Now, he may have an interest in testifying a certain way, right?
> A. Yes.
> Q. May have an interest in pleasing the police, right?
> A. Yes.
> Q. And testifying the way that they want him to, right?
> A. Yes.
> Q. Can you imagine a scenario where the police sit there and work with the witness to

the point where he said pretty much what they want him to say?
> A. Yes.

**23.** Mata's opening statement included the following remarks:

> I would ask you, members of the jury, to keep a few things in mind, as you hear the evidence. The first thing is that both Alvin Morgan and Stephen Kona have made plea agreements with the State of Hawaii. What the plea agreement means is that at the time that they were caught, both men gave information to the police in exchange for deals and under the deals, neither one would suffer the full consequences of their actions.
>
> ....
>
> Now, keep in mind what the motives are for each of these witnesses that are testifying.

Similarly, Okumura's opening statement recounted some of Morgan's criminal history and relationship with Okumura, and then stated that "it is with this type of dynamics that essence the 'frame up' of Leslie Okumura occurred.... It is under that type of background that Al Morgan would become a police informant, a bought and paid-for snitch." In addition, Okumura's opening statement claimed that "Stephen Kona [was] induced to enter into a win/win deal with HPD[.]"

**24.** The closing arguments were not transcribed as part of the record on appeal.

F.2d 1260, 1267 (7th Cir.) (holding that failure to give accomplice witness instruction was harmless where court instructed jury to take each witness's interest into account and accomplice witness was cross-examined fully), *cert. denied*, 484 U.S. 815, 108 S.Ct. 67, 98 L.Ed.2d 31 (1987); *Smith*, 461 A.2d at 1076 (holding that trial court's refusal to give accomplice witness instruction was not error where general witness credibility instructions were given and the jury was fully informed about the accomplice witness's motives to testify).

### J. *Jury instructions regarding proof necessary to convict Okumura of conspiracy*

Okumura next contends that the jury was not adequately instructed with respect to its ability to convict him of both the conspiracy and substantive offense charges. At trial, Okumura requested two instructions on this issue, both of which were refused. Okumura's requested jury instruction no. 18 stated: "A defendant may not be convicted of more than one offense if one offense consists only of a conspiracy to commit the other." Okumura's requested supplemental jury instruction no. 2 stated: "You may not convict the defendants of both the substantive Burglary offenses and the Conspiracy offense. You may only consider the guilt or innocence of the defendants as to the Conspiracy offense if you find them not guilty of the underlying Burglary offenses."

The prosecution argues that Okumura's requested instructions did not adequately explicate the law in this area and were properly rejected. We agree.

At first glance, the instructions requested by Okumura appear to reflect the law set forth in HRS § 701–109(1)(b) (1985) and *State v. Reyes*, 5 Haw.App. 651, 706 P.2d 1326, *reconsideration denied*, 5 Haw.App. 683, 753 P.2d 253 (1985). HRS § 701–109(1)(b) provides:

(1) When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. He may not, however, be convicted of more than one offense if:

(b) One offense consists only of a conspiracy or solicitation to commit the other[.]

Furthermore, in *Reyes*, the ICA held that when a defendant is tried on two charges, one for a substantive crime and one for conspiracy to commit that crime, "if both counts are submitted to the jury, the jury must be instructed that it may decide the conspiracy count only in the event it does not find the defendant guilty of the [substantive] count." 5 Haw.App. at 658, 706 P.2d at 1330.

In the instant case, however, Okumura was not simply charged with one substantive crime and conspiracy to commit that crime. Rather, Okumura was charged with three burglary offenses (the Ihara, Sano, and Kobayashi burglaries) and conspiracy to commit those three burglaries as well as the Parsa burglary.

In *State v. Hackett*, 7 Haw.App. 526, 783 P.2d 1232, *cert. denied*, 71 Haw. 668, 833 P.2d 901 (1989), the ICA explained that when an alleged conspiracy involves multiple criminal objectives, the conspiracy

involves a distinct danger in addition to that involved in the actual commission of any specific offense.... Thus, there may be a conviction of both a conspiracy and a completed offense committed pursuant to that conspiracy if the prosecution shows that the objective of the conspiracy was the commission of offenses in addition to that for which the defendant has been convicted.

7 Haw.App. at 530–31, 783 P.2d at 1235 (quoting Model Penal Code § 1.07 commentary at 109 (1985)). Accordingly, the ICA ruled that

[u]nder HRS § 701–109(1)(b), those who conspire to commit more than two criminal acts and commit two of the criminal acts may be convicted of three crimes (committing the two criminal acts and conspiracy to commit the other criminal act(s)). As long as the conspiracy count of which they are convicted involves overt acts in furtherance of one or more crimes other than the two committed, its inclusion of the two committed as some, but not all, of the

conspiracy's overt acts neither invalidates nor precludes conviction of three crimes. *Id.* at 529, 783 P.2d at 1234.[25]

In the instant case, Okumura was charged with conspiracy to commit four burglaries and was convicted of committing only two of those burglaries. Thus, the jury could have convicted Okumura of the conspiracy charge; however, the conspiracy conviction was proper only if it were based on one or both of the burglaries for which Okumura had not been convicted.

▇▇▇ The jury instructions requested by Okumura did not accurately explain the law in this area to the jury. The circuit court, therefore, properly refused to give them in the form requested. *See State v. Riveira,* 59 Haw. 148, 154, 577 P.2d 793, 797 (1978). However, as discussed in section II. I., *supra,* when instructions are necessary in order for the jury to "have a clear and correct understanding of what it is that they are to decide" and the instructions requested by the parties are "inaccurate or incomplete instructions, 'the trial court has a duty to, with the aid of counsel, either correct the defective instruction or to otherwise incorporate it into its own instruction.'" *State v. Kupau,* 76 Hawai'i 387, 395, 879 P.2d 492, 500 (1994) (citations and emphasis omitted); *accord Riveira,* 59 Haw. at 155, 577 P.2d at 797.

▇▇ The circuit court eventually instructed the jury that it could convict Okumura of the conspiracy if "any" overt act were proved. Based on this instruction, we cannot tell whether Okumura's conspiracy conviction was based on overt acts other than those related to the Ihara and Kobayashi burglaries. The necessity of more thorough instructions was foreseen by the ICA in *Hackett:*

The possibility that Defendants could have been convicted of [the conspiracy] even if some of the overt acts alleged were rejected causes potential problems.

. . . .

If Defendants had been convicted of [the conspiracy] in a jury trial, would we be able to determine whether Defendants were guilty of more overt acts than those alleged in the [substantive crimes]?

. . . .

Obviously, this issue is best addressed when drafting the charge or indictment and when jury instructions ... are being settled.

7 Haw.App. at 530 n. 4, 783 P.2d at 1235 n. 4.

In the instant case, the jury should have been instructed to only consider the conspiracy charge after first reaching verdicts as to all of the substantive burglary charges. Furthermore, the circuit court should have instructed the jury that when considering the conspiracy charge, in order to return a guilty verdict, it would have to find: (1) that the objective of the conspiracy was the commission of one or more burglaries other than any burglaries on which it had reached a guilty verdict; and (2) that Okumura or one of his co-conspirators had committed an overt act in furtherance of that burglary (or burglaries).

In the instant case, the failure to properly instruct the jury was harmless as to the convictions for the two substantive burglaries. *See Reyes,* 5 Haw.App. at 659, 706 P.2d at 1330–31. Therefore, we will not vacate Okumura's convictions and sentences for the Ihara and Kobayashi burglaries because of the incomplete jury instructions.

On the other hand, we cannot conclude that the circuit court's failure to properly instruct the jury as to which overt acts it could consider was harmless. Although the prosecution had alleged overt acts related to the Sano and Parsa burglaries, the jury did not convict Okumura of the Sano burglary and we cannot know which of the overt acts it found had been proven beyond a reasonable doubt. Therefore, Okumura's conviction and sentence for the conspiracy must be vacated and remanded for a new trial to determine whether Okumura conspired to

---

**25.** The rule in *Hackett,* of course, applies not only when a defendant conspires to commit more than two offenses and commits two of those offenses, but applies anytime the objective of the conspiracy includes the commission of one or more offenses in addition to any offense(s) of which the defendant has been convicted.

commit crime(s) other than the Ihara and Kobayashi burglaries.

### K. *Appropriateness of extended term sentencing*

Okumura's final argument is that the circuit court erred when it sentenced him to extended terms of imprisonment because Okumura's prior sexual assault and escape convictions that occurred between 1974 and 1978 were "stale" and provided an insufficient basis for the court to find that extended terms were necessary for the protection of the public.

▉ The leading case in this jurisdiction regarding extended term sentencing is *State v. Huelsman,* 60 Haw. 71, 588 P.2d 394 (1978), *reh'g denied,* 60 Haw. 308, 588 P.2d 394, 407 (1979). In that case, this court set out the procedure that must be followed when the prosecution requests the imposition of an extended term of imprisonment under HRS § 706–662 (Supp.1992). "Each of the subsections of § 706–662 requires the trial court to engage in a two-step process to impose a sentence for an extended term. The first step involves a finding by the court that the defendant is within the class of offenders to which the particular subsection applies." *Huelsman,* 60 Haw. at 76, 588 P.2d at 398; *accord State v. Schroeder,* 76 Hawai'i 517, 527, 880 P.2d 192, 202 (1994). In the instant case, the prosecution alleged that extended term sentencing was warranted under subsections (1) and (4) of HRS § 706–662.[26]

The determination that the defendant is a member of the class of offenders to which the particular subsection of [HRS] § [706–]662 applies involves 'historical facts', the proof of which exposes the defendant to punishment by an extended term sentence, similar to the manner in which the proof of his [or her] guilt exposes him [or her] to ordinary sentencing. For the reasons which we stated in [*State v. Kamae,* 56 Haw. 628, 548 P.2d 632 (1976)], the procedural standards laid down in that case apply to that phase of a [HRS] § [706–]664 hearing in which proof is made that the defendant is a persistent offender, a professional criminal, a dangerous person, a multiple offender or an offender against the elderly or handicapped.

*Huelsman,* 60 Haw. at 79, 588 P.2d at 400; *accord Schroeder,* 76 Hawai'i at 528, 880 P.2d at 203. In *Kamae,* we held that the facts required to be determined "must be established by proof beyond a reasonable doubt and subject to the ordinary rules of evidence." *Huelsman,* 60 Haw. at 77, 588 P.2d at 399; *accord Schroeder,* 76 Hawai'i at 528 n. 18, 880 P.2d at 203 n. 18.

At the sentencing hearing, the circuit court found that Okumura was both a persistent and multiple offender. Okumura does not contest those findings. Moreover, even when Okumura's conspiracy conviction is not considered,[27] the remaining two burglary convictions for which Okumura was being sentenced suffice to establish that Okumura was a multiple offender under HRS § 706–662(4). Thus, the circuit court did not err in the first step of the extended term sentencing procedure.

---

26. HRS § 706–662(1) and (4) provide:
   **Criteria for extended terms of imprisonment.** A convicted defendant may be subject to an extended term of imprisonment under section 706–661, if the convicted defendant satisfies one or more of the following criteria:
   (1) The defendant is a persistent offender whose imprisonment for an extended term is necessary for the protection of the public. The court shall not make such a finding unless the defendant has previously been convicted of two felonies committed at different times when the defendant was eighteen years of age or older.
   . . . .
   (4) The defendant is a multiple offender whose criminal actions were so extensive that a sentence of imprisonment for an extended term is necessary for the protection of the public. The court shall not make such a finding unless:
   (a) The defendant is being sentenced for two or more felonies or is already under sentence of imprisonment for felony; or
   (b) The maximum terms of imprisonment authorized for each of the defendant's crimes, if made to run consecutively would equal or exceed in length the maximum of the extended term imposed, or would equal or exceed forty years if the extended term is imposed for a class A felony.

27. As discussed in section II.J, *supra,* Okumura's conspiracy conviction must be vacated.

"After the first step of this process has been completed and the defendant has been found by the court to be within the class of offenders specified by the particular subsection, the court must determine ... that the defendant's commitment for an extended term is necessary for the protection of the public." *Huelsman,* 60 Haw. at 77, 588 P.2d at 398; *accord Schroeder,* 76 Hawai'i at 528 & n. 17, 880 P.2d at 203 & n. 17.[28] In contrast to the procedural standard required in the first step of the procedure, "the process by which the court determines that the defendant's commitment for an extended term is necessary for the protection of the public ... is one which deals with the subject matter of ordinary sentencing." *Huelsman,* 60 Haw. at 79–80, 588 P.2d at 400. Under ordinary sentencing procedures, the court is "afforded wide latitude in the selection of penalties from those prescribed and in the determination of their severity. This authority is normally undisturbed on review in the absence of an apparent abuse of discretion or unless applicable statutory and constitutional commands have not been observed." *State v. Johnson,* 68 Haw. 292, 296, 711 P.2d 1295, 1298 (1985) (citations and quotation marks omitted); *see also State v. Freitas,* 61 Haw. 262, 277, 602 P.2d 914, 925 (1979) ("The ultimate question of whether the defendant should be sentenced to an extended term under HRS § 706–662 is discretionary with the trial court.")

The question before us, then, is whether the circuit court abused its discretion in determining whether an extended term was necessary for the protection of the public. "Generally, to constitute an abuse it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Kam Fui Trust v. Brandhorst,* 77 Hawai'i 320, 324, 884 P.2d 383, 387 (App.1994).

In order to engage in meaningful review of a sentencing court's decision without involving ourselves unduly in the exercise of the court's discretion, we require the sentencing court to "state on the record its reasons for determining that commitment of the defendant for an extended term is necessary for protection of the public and ... enter into the record all findings of fact which are necessary to its decision." *State v. Tamura,* 63 Haw. 636, 639, 633 P.2d 1115, 1118 (1981) (quoting *Huelsman,* 60 Haw. at 92, 588 P.2d at 407). Thus, in *Tamura,* the record revealed that the sentencing court had based the extended term sentence on (1) the defendant's lengthy criminal record, (2) the fact that the offense at issue was the defendant's fourth felony conviction, (3) the manner in which the defendant committed the offense, and (4) the fact that a weapon was used in the commission of the offense. *Id.* On that record, we were able to conclude that the trial court did not abuse its discretion in determining that an extended term was necessary for the protection of the public. *Id.*

In the instant case, on the other hand, the circuit court did not state on the record its reasons for determining that sentencing Okumura to an extended term was necessary for protection of the public[29] and did not enter

28. Prior to 1987, HRS § 706–662(4) provided that an extended term of imprisonment could be imposed if "[t]he defendant is a multiple offender whose criminality was so extensive that a sentence of imprisonment for an extended term is warranted." HRS § 706–662(4) (1985). In *State v. Alexander,* 62 Haw. 112, 612 P.2d 110 (1980), we ruled that in order for an extended term to be "warranted," the sentencing court would be required to find,

from the nature and circumstances surrounding the commission of the offenses for which [the defendant] has been convicted, that [the defendant] has exhibited a callous disregard for laws enacted for the safety and welfare of society *and* that [the defendant's] incarceration

for an extended term is necessary for the protection of the public[.]

62 Haw. at 118, 612 P.2d at 114 (emphasis in original). In 1986, however, the legislature amended HRS § 706–662(4) so that the sentencing court would only be required to find that a multiple offender's incarceration for an extended term "is necessary for the protection of the public." *See* Act 314, § 40, 1986 Haw.Sess.Laws 593, 612.

29. The circuit court ruled as follows:

Based upon the five felony convictions that is [sic] submitted into court, the Court at this time will also take judicial notice of the files and records pertaining to each of the documents.

any findings of fact to support its decision. On the state of the record, we cannot properly review the circuit court's decision to impose extended terms. Therefore, we remand this case to the circuit court for specification of the reasons for determining that extended terms were necessary for the protection of the public and entry of findings of fact to support that determination.

### L. *Cumulative effect of trial errors*

Finally, Mata contends that there were numerous instances of erroneous rulings by the circuit court and improper conduct by the prosecutor and, citing *State v. Kahalewai,* 55 Haw. 127, 516 P.2d 336 (1973), argues that the "cumulative weight of the errors" deprived him of a fair trial. We disagree. We have reviewed the trial record and cannot conclude that Mata was denied a fair trial.

### III. *CONCLUSION*

For the foregoing reasons, we vacate Okumura's conviction and sentence on the conspiracy charge and remand for a new trial. In addition, we affirm Okumura's convictions on the burglary charges but remand to the circuit court for clarification of the record with respect to its decision to impose extended terms of imprisonment. Finally, we affirm Mata's conviction and sentence on the conspiracy charge.

---

Court find [sic] that defendant Okumura [is a persistent offender and a multiple offender] inasmuch as the—based upon the documents, criminality was so extensive the Court find [sic] that the—the extended term of imprisonment shall be granted, the motion shall be granted.

The circuit court not only failed to find that extended term sentencing was necessary for the protection of the public, but also used language found in the pre–1987 version of HRS § 706–662(4) (i.e., "criminality was so extensive").