STATE OF HAWAI'I, Plaintiff-Appellee/Cross-Appellant,[1]
v.
MICHAEL TOLENTINO, Defendant-Appellant/Cross-Appellee (CR. NO XX-X-XXXX) and
STATE OF HAWAI'I, Plaintiff,
v.
FLORDELINO DELOS SANTOS, Defendant (CR. NO. 02-1-2817)
No. 28492
Intermediate Court of Appeals of Hawaii
September 22, 2009.
On the briefs:
Michael J. Park, for Defendant-Appellant
Stephen K. Tsushima, Deputy Prosecuting Attorney, City and County of Honolulu, for Plaintiff-Appellee

MEMORANDUM OPINION
NAKAMURA, Chief Judge, WATANABE, and LEONARD, JJ.
Defendant-Appellant Michael Tolentino (Tolentino) appeals from the April 2, 2007, Judgment of the Circuit Court of the First Circuit (circuit court),[2] which was entered after his retrial. Tolentino was initially convicted after a jury trial of second-degree robbery and resisting arrest. He appealed, and in a memorandum opinion, this court affirmed Tolentino's conviction and sentence for resisting arrest, but vacated his second-degree robbery conviction and remanded for a new trial on the robbery count. State v. Tolentino, No. 26446, 2006 WL 1071907 (Hawai'i App. Apr. 20, 2006) (memorandum opinion) (hereinafter "Tolentino I").
A disputed issue at both the first trial and the retrial was the identity of the robber. Although Tolentino admitted being at the scene of the robbery, he claimed that his co-defendant, Flordelino Delos Santos (Delos Santos),[3] was the person who actually committed the robbery. Prior to the retrial, Tolentino moved to suppress the pre-trial identification made by Kawika Keola (Keola) on the ground that the one-person field "showup" conducted by the police was impermissibly suggestive and rendered Keola's identification of Tolentino unreliable. Tolentino had not moved to suppress Keola's identification prior to or during the first trial.
The circuit court denied Keola's suppression motion. At the conclusion of Tolentino's second trial, Tolentino was again found guilty of second-degree robbery by a jury. The circuit court sentenced Tolentino to imprisonment for ten years, with a mandatory minimum term of three years and four months.
On appeal, Tolentino argues that the circuit court: 1) abused its discretion in denying his motion to continue the hearing on his motion to suppress; and 2) erred in denying his motion to suppress Keola's identification.
We hold that the circuit court erred in denying Tolentino's motion to suppress and in admitting evidence of Keola's identification of Tolentino at trial. Accordingly, we vacate Tolentino's second-degree robbery conviction and remand the case for a new trial. In light of our holding, we need not consider Tolentino's other claim of error.

I.
An elderly woman was struck on the head from behind as she was walking home from church. When she fell to the ground, someone grabbed her purse. The woman did not see who hit her.
When the robbery occurred, Keola and his girlfriend, Shanel Inay (Inay), were in their car on Ala Ilima Street stopped at a traffic light at the intersection of Ala Ilima and Ala Lilikoi Streets in Salt Lake. Inay was driving and Keola was in the front passenger seat. Ala Ilima is two-laned road and Ala Lilikoi is a four-laned road that is approximately 48 feet wide.
Keola looked across the intersection and saw a male, who was running on the sidewalk along Ala Ilima and carrying something "football style," jump into a Nissan pickup truck parked on Ala Ilima. The truck drove past Keola in leaving the scene. Keola thought something did not look right so he took down the truck's license plate number as the truck drove past. Keola called 911 after Inay found an injured lady down on the sidewalk. Keola provided a description of the truck and its license plate number and indicated that there were two "local guys" in the truck.
Honolulu Police Department (HPD) Officer Kaloheaulani Kawaa located the truck a short time after HPD issued an all points bulletin for the truck. Tolentino was alone in the truck. Tolentino exited the truck, and after a brief encounter with Officer Kawaa, Tolentino turned and ran away. During the ensuing chase, Tolentino's clothes were removed except for his boxer shorts. Officer Kawaa eventually apprehended Tolentino with the assistance of another officer. Tolentino told the police that Delos Santos was the one responsible for the robbery. The truck was searched and the robbery victim's purse and its contents were found inside the truck.
HPD officers conducted a field showup in which Tolentino was the sole subject and drove Keola and Inay past Tolentino in separate cars. Tolentino was only wearing his boxer shorts and he was wet. Keola identified Tolentino as the man he had seen running to the truck. Inay did not identify Tolentino.

II.
Tolentino appealed his conviction for second-degree robbery entered pursuant to his first trial. In his first appeal, Tolentino argued, among other things, that:
1) his trial counsel provided ineffective assistance in failing to move to a) suppress evidence of [Keola's] identification of Tolentino at a pre-trial "showup" as impermissibly suggestive and b) exclude in-court identifications by [Keola and Inay], who had been exposed to the showup, as unreliable; [and] 2) the circuit court erred in allowing Delos Santos's written statement to the police that implicated Tolentino in the robbery to be read to the jury as a past recollection recorded[.]
Tolentino I, at 2-3 (footnote omitted).
In our memorandum opinion in Tolentino I, we described the trial evidence regarding Keola's showup identification, Keola's and Inay's in-court identifications, and certain discrepancies surrounding the identifications.
Prior to the showup, Keola had given a description to the police of the man he saw running to the truck. Keola described the man as being a Filipino Hawaiian mix, in his late 20's, about 5 feet 3 inches or 5 feet 4 inches tall, weighing 130 or 140 pounds, having shoulder length wavy hair with Jheri curls, and wearing a baseball cap, sunglasses, a black Members Only jacket, and blue jeans. Keola saw only the person who ran and got into the passenger side of the truck; he did not see the driver.
Keola's description of the man he saw running to the truck did not match Tolentino in several respects. At trial, Tolentino testified, without contradiction, that he was 5 feet 9 inches tall, weighed 215 pounds, and had short hair at the time of the robbery. A photograph taken at the time of Tolentino's arrest showing him with short-cropped hair was also admitted in evidence. On the other hand, Delos Santos testified that at the time of the robbery, he was 5 feet 5 inches or 5 feet 6 inches tall. Delos Santos could not recall how much he weighed. Delos Santos had long hair when he testified at trial; he could not recall his hair style when the robbery occurred.
During the field showup, Keola was driven slowly past Tolentino. HPD Officer Charles Crowder, who drove Keola, testified that Keola identified Tolentino as the person Keola had seen running with the bag. According to Officer Crowder, Keola stated that he recognized Tolentino's face and that Keola was positive about the identification. Keola also identified the Nissan truck as the one Keola had previously seen at the scene of the robbery and a baseball cap inside the truck as the cap worn by "the suspect."
In testifying at trial, Keola acknowledged that he had identified the individual presented at the showup but expressed some uncertainty over how sure he had been about that identification. During questioning by the Deputy Prosecuting Attorney (DPA), Keola stated as follows:
KEOLA: When they took us to go identify that suspect, I mean it's totally different. The person was only wearing a pair of boxers. And he was all wet. Looked like he was wet or sweating or something.
DPA: And when you were  so you say the police eventually took you to another location?
KEOLA: Yeah.
DPA: And did they show you one person or two persons?
KEOLA: Just one person.
DPA: And when they showed you that one person, who did you identify that one person to be?
KEOLA: I said I think that's the guy that wasthat was the passenger. The guy that was  I saw run. But it's hard because I mean he wasn't  he didn't have nothing on. He only had a pair of boxers on. That's all. I mean he didn't have nothing else on that I saw the person that I described. Wasn't the same.
....
DPA: So even' though he was dressed differently, what is it that made you say what is it that made you think that it was the same person that was getting into the passenger side of the car?
KEOLA: I don't know. It was  it all seemed different because the person I described was this guy looked taller. But this guy looked big when I saw him. But when I described the person I said that he was like running down, like downwards. But I say he was a little bit shorter. So I mean it was kind of confusing at the time right there.
At trial, the DPA pointed to Tolentino and asked Keola if he recognized Tolentino as "the passenger who got into that vehicle." After a prolonged pause, Keola answered, "Yes."
Inay did not identify the individual presented during the pre-trial showup but identified Tolentino in court as the person she had seen "jump into the truck." Inay explained her failure to identify Tolentino at the showup by stating that the police asked only if the person at the showup was the driver. Inay testified that she recognized the person at the showup as the passenger but did not say anything because, the police had asked if he was the driver[.]
....
Inay testified that on the day of the robbery, Tolentino wore a baseball cap, turned backwards, had a black and white windbreaker jacket, and was running like he was carrying something. She saw Tolentino get into the truck on the passenger side. Inay stated that from a distance, it looked like the passenger had long, wavy hair, but when the truck drove by, "it looked like he wasn't wearing a wig or anything. I just saw a cap, a baseball hat." Inay did not see the driver's face but described his hair as "dirty brown blonde, maybe kind of long."
Tolentino I, at 6-9 (some ellipsis points in original; emphases added).
We vacated Tolentino's second-degree robbery conviction in Tolentino I because we concluded that the circuit court had erred in permitting Delos Santos's written statement to the police to be read to the jury as a past recollection recorded. Id. at 15-20. Thus, we did not address Tolentino's ineffective-assistance-of-counsel claim. Id. at 21. However, we cited the questions raised about the validity of Keola's and Inay's identifications of Tolentino in support of our determination that the error in admitting Delos Santo's statement was not harmless. Id.

III.
Prior to the retrial, Tolentino filed a motion to suppress Keola's pre-trial identification of Tolentino. On the day of the scheduled hearing on the motion, Tolentino orally requested a continuance so that he could attempt to secure Keola as a witness. The defense proffered that it believed Keola would confirm that the police "had possibly suggested who they had under arrest" to Keola before the showup. The circuit court denied the request for a continuance.
The circuit court ruled that for purposes of the hearing on the suppression motion, it would take judicial notice of, and consider as evidence, the trial transcripts from Tolentino's first trial, HPD Officer Charles Crowder's police report, and a suspect description form that Keola prepared for the police. The only witness presented by the State at the hearing was Officer Crowder. Officer Crowder testified that prior to the showup, Keola stated that "he could possibly identify" the male he saw running. Officer Crowder informed Keola that the police had a possible suspect matching the description Keola had provided and that Officer Crowder would be driving Keola to the Kalihi area to possibly identify the person.
Officer Crowder testified that there were police officers in the area of the field showup as well as Tolentino, who was wearing only boxer shorts and was probably handcuffed. Keola identified Tolentino as the person Keola had seen with the lady's bag. Officer Crowder asserted that Keola said he recognized Tolentino's face and that Keola was positive about the identification. The defense, without objection, offered for the circuit court's consideration a mug shot and rap sheet of Delos Santos, which the court accepted.
The circuit court orally denied Tolentino's motion to suppress. The circuit court found that although the showup was impermissibly suggestive, under the totality of the circumstances, Keola's identification was "sufficient[ly] reliable" to be presented at trial.
In its oral ruling, the circuit court discussed the five factors set forth in Neil v. Biggers, 409 U.S. 188, 197-200 (1972), for determining whether an impermissibly suggestive identification procedure has resulted in the very substantial likelihood of an irreparable misidentification, namely: 1) the witness's opportunity to view the criminal at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of the witness's prior description of the criminal; 4) the level of certainty demonstrated by the witness at the identification confrontation; and 5) the length of time between the crime and the confrontation. The circuit court found that: 1) Keola had the opportunity to view the suspect because the weather was good, Keola saw the suspect for 10 to 15 seconds, and Keola had an unobstructed view of the suspect running toward him; 2) Keola's attention was focused on the suspect because Keola thought something unusual was happening; 3) some aspects of Keola's prior description were accurate (such as age, ethnic background, and hair and skin color) and other aspects were not accurate (such as the height and wavy, shoulder-length hair);[4] 4) there was a sufficient level of certainty; and 5) the length of time between the crime and identification confrontationan hour an forty-five minuteswas "pretty brief."
The circuit court subsequently filed its Findings of Fact, Conclusions of Law and Order Denying Defendant's Motion to Suppress Pretrial Identification of Defendant. The circuit court's findings of fact relevant to the issue of the reliability of Keola's identification include the following:
2. Shanel Inay (Inay) was the driver of a vehicle stopped at the intersection of Ala Ilima Street and Ala Lilikoi Street (the "Subject Intersection") facing in the ewa direction.
3. Kawika Keola (Keola) was sitting in the front passenger seat of Inay's vehicle.
4. At the time, the weather was clear, and the morning sun was behind Inay's vehicle.
5. Directly across the Subject Intersection, Keola and Inay saw a male running toward them.
6. The male was holding something under his arm and was running in a crouched position.
7. Keola and Inay both observed the male enter the passenger seat of a primer gray and black pickup truck (the "Truck") which, from their vantage point, was the first car parked on the left side of the road directly across the Subject Intersection.
8. Keola thought the behavior he observed was indicative of wrongdoing and made note of the Truck's license plate number, FZJ-[***].
9. The time of observation was unobstructed and was estimated by Keola as approximately ten to fifteen seconds.
....
14. Keola described the suspect to the 911 operator and to arriving police officers as a local Filipino male in his late 20's, with a medium build, black hair, wearing jeans, a baseball hat turned backwards, and sun glasses.
....
31. [Tolentino] was the sole participant in the field show-up.
32. At the field show-up, Keola identified [Tolentino] as the person who had Victim's bag.
33. Keola stated that he was positive and that he recognized [Tolentino] by his face.
34. The time elapsed between the incident and the identification was approximately one hour and forty-five minutes.
35. Along with [Tolentino], Keola also identified the pick-up truck and the baseball cap worn by [Tolentino] that was found on the floor of the passenger side of the pick-up truck.

IV.
The case proceeded to trial for the second time. Evidence of Keola's pre-trial identification of Tolentino at the showup was admitted at trial. Keola did not make a separate in-court identification of Tolentino as the person he saw running to the truck, but instead identified Tolentino in court as the person he had identified at the showup. Inay made an in-court identification of Tolentino as the person who ran to the truck carrying something.
Tolentino testified in his own defense at trial. According to Tolentino, on the day of the robbery, he was driving a borrowed truck with Delos Santos as a passenger. As they drove through Salt Lake, Delos Santos asked Tolentino to park near Blockbuster on Ala Ilima Street, and Delos Santos got out of the truck. Tolentino did not know what Delos Santos was going to do. At some point, Delos Santos returned to the truck and told Tolentino to drive to the house of Delos Santos's mother. Tolentino noticed that when Delos Santos returned to the truck, he had a bag with him. Tolentino asked Delos Santos what he had done, but Delos Santos replied, "never mind, never mind."
Tolentino testified that on the day of the robbery, he was wearing a white tank top, tan jeans, and light blue colored glasses. Tolentino stated that on that day, Delos Santos was 5 feet 4 inches tall, weighed 130 or 140 pounds, and was wearing black pants, a dark sweater with a hood, a baseball cap, and sunglasses. A photograph of Delos Santos showing him with long, wavy hair was admitted in evidence.

V.
We apply the following standards in reviewing questions concerning the impermissible suggestiveness of a pre-trial identification procedure and the reliability of a witness's identification.
When the defendant challenges admissibility of eyewitness identification on the grounds of impermissibly suggestive pre-trial identification procedure, he or she has the burden of proof, and the court, trial or appellate, is faced with two questions: (1) whether the procedure was impermissibly or unnecessarily suggestive; and (2) if so, whether, upon viewing the totality of the circumstances, such as opportunity to view at the time of the crime, the degree of attention, and the elapsed time, the witness's identification is deemed sufficiently reliable so that it is worthy of presentation to and consideration by the jury.
State v. Okumura, 78 Hawai'i 383, 391, 894 P.2d 80, 88 (1995) (brackets, quotation marks, and citation omitted). "[T]he questions of suggestiveness and reliability are questions of law that are freely reviewable on appeal." Id. "On the other hand, answering these questions involves determinations of fact by the [trial] court [, and] [a]ppellate review of factual determinations made by the trial court deciding pretrial motions in a criminal case is governed by the clearly erroneous standard." Id. at 392, 894 P.2d at 89 (quotation marks and citations omitted).
The suppression of identification evidence is warranted where the pre-trial identification procedure was impermissibly suggestive and "gave rise to a very substantial likelihood of irreparable misidentification." State v. Malani, 59 Haw. 167, 170, 578 P.2d 236, 238 (1978). As noted, the circuit court concluded that the procedures employed in Tolentino's showup were impermissibly suggestive. The State does not challenge this conclusion on appeal, and we proceed on the assumption that it is correct. Accordingly, we examine whether despite the impermissibly suggestive identification procedure, the identification is nonetheless reliable. State v. Mitake, 64 Haw. 217, 221, 638 P.2d 324, 327 (1981).
We consider the following factors in assessing the reliability of the identification under the totality of the circumstances: 1) the witness's opportunity to view the criminal at the time of the incident; 2) the witness's degree of attention; 3) the accuracy of the witness's prior description of the criminal; 4) the level of certainty demonstrated by the witness at the identification confrontation; and 5) the length of time between the crime and the confrontation. State v. Padilla, 57 Haw. 150, 154, 552 P.2d 357, 360 (1976) (adopting the Neil v. Biggers factors). If a witness's pre-trial identification at an impermissibly suggestive identification confrontation is determined to be unreliable under these factors, then the witness's pre-trial identification as well as any in-court identification by the witness is inadmissible. Mitake, 64 Haw. at 220, 638 P.2d at 327.
Applying these factors to the present case, we conclude that Keola's pre-trial identification of Tolentino lacks sufficient indicia of reliability to permit evidence of Keola's identification of Tolentino to be admitted at trial. In reaching this conclusion, we accept the circuit court's factual findings but disagree with its analysis that these factual findings were sufficient to establish the reliability of Keola's identification.
The record shows that Keola's opportunity to view the man running to the truck was limited by various constraints. From across an intersection, Keola saw a man running for ten to fifteen seconds to a truck parked beyond the intersection on Ala Ilima Street. The man's face was partially obscured by dark sunglasses and a hat. When asked if he was able to see the rest of man's face, Keola testified, "Kind of. But I mean, everything happened so fast. . . . Happened really, really fast." Keola was concentrating on recording the truck's license plate number as the truck drove past Inay's vehicle.
The circuit court cited the clear weather, Keola's ten-to-fifteen-second observation time, and Keola's unobstructed view as factors supporting the reliability of his identification. However, the court did not address the distance from which Keola made his observations. Because Keola's observations were made from across an intersection and involved looking at a man who was running and wearing sunglasses and a hat, the factors cited by the circuit court did not show that Keola had a good opportunity to view the suspect. We conclude that Keola's distance away from the suspect, the relatively short time period during which Keola made his observation, and the other circumstances surrounding Keola's observation cast doubt on the reliability of Keola's identification. See Commonwealth v. Worlds, 399 N.E.2d 1121, 1127 (Mass. App. Ct. 1980) (noting that the witness's opportunity to observe the criminal at the time of the offense is ordinarily the most important factor in determining the reliability of the witness's identification).
The circuit court found that Keola focused on the suspect because he thought the suspect's behavior was unusual. However, this finding is tempered by the distance at which Keola's observations were made and the fact that the suspect was in motion.
Keola's pre-showup description of the man he saw running to the truck differs in significant respects from Tolentino's appearance. Keola described the suspect as being about 5 feet 3 inches or 5 feet 4 inches tall, weighing 130 or 140 pounds, and having shoulder-length wavy hair with Jheri curls. Tolentino is 5 feet 9 inches tall and at the time of the robbery, weighed 215 pounds and had short-cropped hair. See Tomlin v. Myers, 30 F.3d 1235, 1241-42 (9th Cir. 1994) (concluding that doubt was cast on the reliability of the witness's identification where the witness described the criminal as 5 feet 6 inches to 5 feet 8 inches, heavy build, with a half-inch to two-inch afro and the defendant was 6 feet, thin, and wore a shoulder-length, straightened permanent hair style); State v. Pinchback, 537 S.E.2d 222, 227 (N.C. Ct. App. 2000) (finding that victim's pre-confrontation description to the police was unreliable where victim's description of the robber's height and weight differed from that of the defendant by 4 inches and 70 pounds).
The court found that Keola exhibited a sufficient level of certainty in his identification and that the identification took place shortly after the incident. However, these indicia of reliability do not overcome the factors that undermine the reliability of Keola's identification. In particular, we conclude that in this case, the most important factors in assessing the reliability of Keola's identification are Keola's limited opportunity to observe the suspect and the significant discrepancies between Keola's description of the suspect and Tolentino's actual appearance. Considering the totality of the circumstances, we conclude that Keola's pre-trial identification of Tolentino was unreliable and that the evidence of Keola's identification should have been excluded.[5]
The circuit court's error was not harmless beyond a reasonable doubt. See State v. Gano, 92 Hawai'i 161, 176, 988 P.2d 1153, 1168 (1999) (applying the harmless-beyond-a-reasonable-doubt standard to the erroneous admission of evidence). The evidence was conflicting, and the State relied significantly upon Keola's identification in arguing that Tolentino was the person who had robbed the elderly victim. We therefore vacate Tolentino's second-degree robbery conviction and remand the case for a new trial.[6]

VI.
We vacate the April 2, 2007, Judgment of the circuit court, and we remand the case for a new trial and for further proceedings consistent with this Memorandum Opinion.
NOTES
[1] The State of Hawai'i (State) filed a notice of cross-appeal, but the State's cross-appeal was subsequently dismissed by stipulation of the parties. Our references to the parties in this Memorandum Opinion will exclude the cross-appeal designations.
[2] The Honorable Steven S. Aim presided.
[3] Delos Santos was charged in a separate complaint with second-degree robbery. Tolentino's and Delos Santos's cases were consolidated for trial, but Delos Santos pleaded no contest to second-degree robbery before Tolentino's first trial, and Tolentino proceeded to trial alone.
[4] The circuit court also noted that Delos Santos's rap sheet describes him as 5'4" and 190 pounds. The court stated that Delos Santos's height was closer to Keola's description of the suspect (5'4", 140 pounds) than Tolentino's height of 5'9", but noted that Delos Santos's weight (like Tolentino's weight) was off.
[5] Although Tolentino did not challenge Inay's in-court identification on appeal, a similar analysis would apply to her identification. See Mitake, 64 Haw. at 220, 638 P.2d at 327; United States v. Emanuele, 51 F.3d 1123, 1128-31 (3rd Cir. 1995). Inay was exposed to the same pre-trial showup, which the circuit court ruled was impermissibly suggestive, as Keola. She was also hampered by the same limited opportunity to observe the suspect as Keola and provided a description of the suspect that differed from Tolentino in material respects. For example, Inay described the person she saw running to the truck as having wavy, shoulder-length hair.
[6] In addition to contending that Tolentino was the actual robber, the State argued, and the jury was instructed, that Tolentino could be found guilty as an accomplice.